846 F.2d 1539
 46 Empl. Prac. Dec. P 37,972, 57 USLW 2014,
3 Indiv.Empl.Rts.Cas. 673
 Roland M. LOVVORN; Richard Jarvis; and Michael Kennedy, on
their behalf and on behalf of all others similarly
situated, Plaintiffs-Appellees,
v.
The CITY OF CHATTANOOGA, TENNESSEE; Gene Roberts,
individually and as the Mayor of the City of Chattanooga,
Tennessee; Thomas Kennedy, Paul Clark, James Eberle, and
John Franklin, individually and as Commissioners for the
City of Chattanooga, Tennessee; and Jerry W. Evans,
individually and as the Chief of the Fire Department of the
City of Chattanooga, Tennessee, Defendants- Appellants.
 No. 86-6281.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 17, 1987.
Decided May 23, 1988.
 
 Thomas Woodley (argued), Mulholland & Hickey, Washington, D.C., for plaintiffs-appellees.
 Michael A. McMahan, Randall L. Nelson, argued, Chattanooga, Tenn. for defendants-appellants.
 Before MARTIN and GUY, Circuit Judges and JOHNSTONE, Chief District Judge.*
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 The single issue presented in this appeal is whether the City of Chattanooga's mandatory urinalysis testing of its fire fighters, on a department-wide basis, without reasonable cause or suspicion to believe that the fire fighters tested used controlled substances, violates the plaintiffs' rights under the fourth amendment to the United States Constitution. Three fire fighters employed by the City of Chattanooga brought this action against the City, the members of the City's Board of Commissioners, and the Chief of the City's Fire Department. The defendants appeal the decision of the district court enjoining the planned urinalyses as violative of the fourth amendment. 647 F.Supp. 875.
 
 
 2
 The drug screening at issue here involved all emergency service personnel, including regular fire fighters and emergency medical or ambulance personnel, who are also cross-trained as fire fighters. The directive did not apply to secretaries, clerks, or other so-called "civilian" employees. Among the civilian employees not tested were the dispatchers who received the incoming calls and directed the fire fighters to their assignments.
 
 
 3
 The testing at issue here was to be conducted in substantially the same manner as the testing of all fire fighters which had occurred in the spring of 1985. It is necessary, therefore, to recount some relevant history.
 
 
 4
 In 1983, Tom Kennedy was elected Commissioner of Fire and Police for the City of Chattanooga. In this position, he is responsible for running the Chattanooga Fire and Police Departments, subject to the overall supervision of a five-member Board of Commissioners, of which he is a member. In early 1984, some civilian employees were "caught or almost caught" smoking marijuana and were disciplined. As a result, Commissioner Kennedy, along with Police Chief McCutcheon and then Fire Chief A.O. Powell, decided to conduct urine tests for marijuana. All members of the Chattanooga Fire and Police Departments were to be tested.
 
 
 5
 Word that the drug testing was going to occur was spread through "the grapevine." On April 16, 1985, shortly before the testing was to begin, formal notice of the testing was given when Fire Chief Powell sent a memorandum to all fire fighters advising them that, "while on duty," they were to report to Allied Clinical Laboratories for blood testing to begin April 22, 1985. In late April and early May 1985, groups of fire fighters were taken to Allied Labs and were required to give both blood and urine samples. Because Commissioner Kennedy had "information" that one or more fire fighters to be tested were carrying clean urine samples in balloons in their pants, Kennedy ordered some of the initial donors to be "patted down" in an effort to determine if they were carrying anything that could result in a switched or an adulterated urine sample. Except for fifteen or so donors, all urine samples were given by the fire fighters under the direct observation of a Deputy or Assistant Fire Chief. Allied Laboratories subjected the samples to the Enzyme Multiple Immunoassay Technique (EMIT) test, which, on the average, is about 95% accurate. All uniformed fire fighters were tested. The urine tests were mandatory. One fire fighter was terminated for refusing to submit to the test.
 
 
 6
 The 1985 urine tests were not conducted pursuant to any written orders, guidelines, or standards. None of the methods for testing, nor any of the standards for handling or analyzing the urine specimens, nor any procedures for implementation of discipline, were ever put in writing. Not surprisingly, there was confusion concerning the precise test result which triggered discipline. The City applied varying standards for determining whether an employee tested positive or negative. Urine testing 100 nanograms of cannaboids (ng) per millileter (ml) or more was considered "positive." Urine testing from 50 to 100 ng/ml was considered "trace." Urine testing from 20 to 50 ng/ml was considered "minus trace." All fire fighters testing at "minus trace" or above, e.g., over 20 ng/ml, were retested. Fire fighters who tested "trace" positive or "minus trace" positive on the first test and negative on the second test were placed on one year probation and subject to unannounced drug screens. Those fire fighters who tested "positive" on one of the later unannounced drug screens were fired.
 
 
 7
 Those fire fighters with two "positive" EMIT tests were suspended from their jobs, informed of the test results, and given a hearing before Chief Powell. Their names were released to the press at the time of their suspension. At the hearing before Chief Powell, the fire fighters were permitted to make whatever explanation they could of the test results. The fire fighters were cited for disobeying Chattanooga Fire Department Rules and Regulations Sec. 38, General Conduct, 38.11 which states:
 
 
 8
 No member shall report for, or be on duty under the influence of any intoxicating liquors, drugs or compounds, nor shall he absent himself from duty, or render himself unfit to fully perform his duties for reasons, attributable to, or produced by indulgence in intoxicants.
 
 
 9
 Commissioner Kennedy disciplined the fire fighters based on Powell's recommendation. The discipline included probation, suspension, demotion in rank, or termination depending upon the level of test results and the rank of the fire fighter. Of the 400 fire fighters tested, 25 of them were found to have some level of illegal drugs in their system in 1985.
 
 
 10
 As a result of the May tests, and after some additional tests in August and September 1985, ten employees were terminated by the city, five resigned, and seventeen were placed on probation. Several of the terminated fire fighters took advantage of their right under a city ordinance for a post-termination hearing before the full Chattanooga City Commission. The Commission upheld the terminations. Several of these fire fighters have taken their cases, pursuant to state law, to the Chancery Court of Hamilton County, Tennessee, where the cases will be reviewed on the record.
 
 
 11
 After the May testing was completed and most of the discipline administered, Commissioner Kennedy had the positive EMIT tests confirmed by Compu-Chem Laboratories, in Raleigh, North Carolina. Compu-Chem performed gas chromotography/mass spectrometry tests on the samples. These tests, which are virtually 100% accurate, confirmed the results of the previously administered EMIT tests.
 
 
 12
 Several of the fire fighters terminated in 1985 participated in a drug rehabilitation program at Valley Psychiatric Hospital. That treatment was covered by the City's health insurance program. A number of these employees have been rehired and are subject to unannounced urine retests.
 
 
 13
 Because one of the rehired fire fighters again tested positive, and because Commissioner Kennedy was told by one or more of the fire fighters who were disciplined in 1985 that some fire fighters in 1985 had switched urine samples, Commissioner Kennedy decided in the summer of 1986 to give mandatory urine tests to the entire fire department once again. There has been no statistical or objective evidence that the performance of any member of the department, or the department as a whole, has been affected by the use of drugs.
 
 
 14
 The parties have stipulated that the proposed tests will be performed in substantially the same manner as they were in 1985. Commissioner Kennedy now states that a 50 nanogram per millileter standard will be used as a "bright line" test for passing or failing, and that there will be no trace or minus trace categories. It is this proposed 1986 testing program that is being challenged here as violative of the fourth amendment of the United States Constitution. While the City of Chattanooga appeals the district court's holding that mandatory drug testing, without reasonable individualized suspicion, constitutes a violation of the fourth amendment, the fire fighters do not challenge the district court's holding that the 1986 testing program did not violate due process requirements. We seek then only to ascertain whether the City's drug testing program violates the fourth amendment.
 
 
 15
 There can be little question, and the City of Chattanooga does not seriously dispute, that the compulsory urinalysis of public sector employees constitutes a "search and seizure" within the meaning of the fourth amendment. In its entirety, the fourth amendment to the United States Constitution states:
 
 
 16
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 17
 By virtue of the fourteenth amendment, the fourth amendment prohibits unreasonable searches and seizures by the states. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).
 
 
 18
 As was made clear in Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), "the fourth amendment protects people, not places." This protection is necessary to safeguard individual privacy and dignity, values basic to a free society. See Winston v. Lee, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). The fourth amendment provides this protection by explicitly prohibiting two types of government intrusions into individual autonomy: searches and seizures. A "search" has occurred, for purposes of the fourth amendment, when the government infringes upon "an expectation of privacy that society is prepared to consider reasonable." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).
 
 
 19
 We join other circuits in holding that mandatory urinalyses of public sector employees constitutes a "search" within the meaning of the fourth amendment. See National Fed'n of Fed. Employees v. Weinberger, 818 F.2d 935 (D.C.Cir.1987); National Treasury Employees Union v. Von Raab, 816 F.2d 170, 176 (5th Cir.1987), cert. granted, --- U.S. ----, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); McDonell v. Hunter, 809 F.2d 1302, 1307 (8th Cir.1987); Division 241 Amalgamated Transit Union v. Suscy, 538 F.2d 1264, 1266-67 (7th Cir.), cert. denied, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976); cf. Shoemaker v. Handel, 795 F.2d 1136, 1142 (3d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). The compelled taking and analysis of a person's urine, like that of a person's blood, falls within the sphere of protection offered by the fourth amendment. See Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908 (1966). To hold otherwise would leave the government unrestrained in requiring urinalyses. We do not believe society would sanction a grant of power to the government that would have the effect of enabling the government to require a urine test of any individual it had legally stopped, even if it had no reasonable suspicion of drug usage. Such an approach would eviscerate the protections of the fourth amendment. See National Treasury Employees Union v. Von Raab, 816 F.2d at 176.
 
 
 20
 The act of urinating is one of the most private of all activities. The subjective expectation of privacy felt by many individuals when urinating is undoubtedly one that society is prepared to consider reasonable. There are few other times where individuals insist as strongly and universally that they be let alone to act in private. Furthermore, the information that may be gleaned from the analysis of an individual's urine compels the conclusion that a mandatory urinalysis, whether directly observed or not, constitutes a "search" within the meaning of the fourth amendment.
 
 
 21
 This conclusion does not change because the City of Chattanooga administered the urine testing in its role as employer rather than as part of a criminal investigation. Regardless of the capacity in which it is acting, be it employer or prosecutor, the government is bound by the constraints of the fourth amendment. As the Supreme Court recently observed in O'Conner v. Ortega, 480 U.S. ----, ----, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714, 721 (1987):
 
 
 22
 [b]ecause the individual's interest in privacy and personal security suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards ... it would be anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.... Searches and seizures by government employers or supervisors of the private property of their employees, therefore, are subject to the restraints of the Fourth Amendment.
 
 
 23
 We recognize that sound policy arguments may be made for why the government should be allowed to act in its capacity as an employer with the same freedoms as private-sector employers. The fact of the matter, however, is that the line between what the private and public sectors may do is one that may be adjusted only by constitutional amendment, not by judicial exercise, for it is a line that was drawn by the Framers of the Constitution, not by members of the judiciary. The fourth amendment, as well as many of the other amendments found in the Bill of Rights, constrains only state actors. Private employers, therefore, can act in ways that if engaged in by the government would violate the Constitution. At oral argument, counsel for the City of Chattanooga conceded that its proposed urinalyses constituted a "search" within the meaning of the fourth amendment. Accordingly, we hold that mandatory urine testing, when conducted by the government, constitutes a search and seizure within the meaning of the fourth amendment.
 
 
 24
 Having said that mandatory urinalysis constitutes a search, we turn now to the critical question of whether such a search of fire fighters is unreasonable. As the Supreme Court said in New Jersey v. T.L.O., 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985), qualification as a "search" "only ... begin[s] the inquiry into the standards governing such searches," for the fourth amendment proscribes only "unreasonable searches and seizures." The determination of whether a search is "reasonable" invariably depends on its particular circumstances and context. See O'Conner v. Ortega, 480 U.S. ----, ----, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714, 722 (1987). This determination of the "standard of reasonableness applicable to a particular class of searches requires balanc[ing] the nature and quality of the intrusion on the individual's singular fourth amendment interests against the importance of the government interests alleged to justify the intrusion." O'Conner, 480 U.S. ----, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)).
 
 
 25
 In Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), the Supreme Court explained that, when conducting this balancing test, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Thus, it is necessary to consult two reference points: (1) the initial basis for instituting the search, and (2) the ensuing manner and scope in which the search was executed. See National Fed'n of Fed. Employees v. Weinberger, 818 F.2d at 943.
 
 
 26
 On one side of the balance is the fire fighters' reasonable expectations of privacy, expectations which society is "prepared to recognize as legitimate." T.L.O., 469 U.S. at 338, 105 S.Ct. at 741 (quoting Hudson v. Palmer, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). See also O'Conner, 480 U.S. ---- - ----, 107 S.Ct. at 1498-99, 94 L.Ed.2d at 723-24. We believe there can be little dispute that society considers reasonable the expectations of its individual members to significant privacy when urinating and in the information urine contains. This expectation is not undermined in any way by the fact that the fire fighters may at times voluntarily urinate in the presence of other fire fighters. That an individual may voluntarily engage in an activity cannot be the basis of granting to the government the power to compel an individual to engage in that activity. Even when fire fighters do voluntarily urinate in the presence of others, it cannot be said that they are indicating that they do not have reasonable privacy expectations in the information contained in the urine. Furthermore, fire fighters who voluntarily expose themselves to others cannot be said to have thereby waived forever afterward their expectations of privacy. Such propositions do not accord with factual reality nor make compelling legal theory.
 
 
 27
 On the other side of the balance is "[t]he governmental interest [in] the efficient and proper operation of the work place." O'Conner, 480 U.S. at ----, 107 S.Ct. at 1501, 94 L.Ed.2d at 727. As was recognized by the district court, there can be no doubt that the City's interest in having its fire fighters free from drugs is a compelling one. Fighting fires is perhaps the most dangerous and hazardous of all professions. It is imperative that those who are charged with the public responsibility of extinguishing fires, sometimes risking their own lives for the sake of someone trapped, be free of the debilitating influences of controlled substances. It is well established that the use of such substances, such as marijuana, can adversely affect one's perception, decision-making time, short-term memory, motor skills, and judgment. Fire fighters so affected become a risk to themselves, their fellow fire fighters, and those depending on them for rescue. We have no hesitation, therefore, in recognizing the compelling nature of the City's interests in keeping its fire fighters free from the effects of illegal drugs.
 
 
 28
 We note that many of the above-described effects of drug usage may also result from excessive consumption of alcohol. Indeed, the problems resulting from alcohol may be of a greater magnitude. Nevertheless, we reject the argument that, because the City tested only for drug usage, we should strike the testing program down on those grounds. Such arguments cloud the complainant's true criticisms of drug testing. More importantly, problems of underinclusiveness are rarely problems of constitutional magnitude unless they signify impermissible discriminatory motives. See Williamson v. Lee Optical, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). That is not the case here. A government decision to treat half of a problem rather than the entire problem may not be wise policy, but it is not an unconstitutional policy.
 
 
 29
 Given the compelling interests of the City of Chattanooga in keeping its fire fighters unimpaired, on the one hand, and the legitimate, constitutionally cognizable expectations of privacy of the fire fighters on the other hand, we turn to the question of "whether the [search] was justified at its inception." T.L.O., 469 U.S. at 341-42, 105 S.Ct. at 743 (quoting Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). The district court determined that, absent reasonable individualized suspicion, the City lacked the necessary justification to institute the urinalyses. The City has argued on appeal that, because of the significance of the government's interests, we should not require a reasonable suspicion of drug use before sanctioning the searches. To support their position, the City cites numerous cases where courts have upheld the testing of various employees without any reasonable suspicion that any of them were in fact using illegal drugs. See Shoemaker v. Handel, 795 F.2d 1136 (3d Cir.), cert. denied, --- U.S. ----, 107 U.S. 577, 93 L.Ed.2d 580 (1986) (upholding drug testing of jockeys and other horse racing employees); Rushton v. Neb. Pub. Power Dist., 844 F.2d 562 (8th Cir.1988) (upholding testing of nuclear plant employees); National Ass'n of Air Traffic Specialists v. Dole, No. A87-073 unpublished slip op. (D.C.Alaska, 3/27/87) (upholding testing of flight service specialists); McDonell v. Hunter, 809 F.2d 1302 (8th Cir.1987) (upholding testing of prison guards with regular contact with prisoners); National Treasury Employees Union v. Von Raab, 816 F.2d 170 (5th Cir.1987), cert. granted, --- U.S. ----, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988) (upholding testing of customs service officials); AFGE v. Dole, 670 F.Supp. 445 (D.D.C.1987) (upholding testing of federal employees whose positions relate to health, safety, national security, or law enforcement); and Mack v. United States F.B.I., 653 F.Supp. 70 (S.D.N.Y.1986) (upholding testing of F.B.I. agents).
 
 
 30
 There is an equally impressive string of citations, however, that can be made for the proposition that a mandatory urinalysis violates the fourth amendment interests of public employees when it is carried out in the absence of reasonable individualized suspicion. Policeman's Benevolent Ass'n of New Jersey, Local 318 v. Township of Washington, 672 F.Supp. 779, 2 IER Cases 965 (D.N.J.1987) (individualized suspicion necessary to test police officers); Feliciano v. City of Cleveland, 661 F.Supp. 578 (N.D.Ohio 1987) (individualized suspicion required to drug test police academy cadets); American Fed'n of Gov't Employees v. Weinberger, 651 F.Supp. 726 (S.D.Ga.1986) (reasonable suspicion needed for urinalysis of civilian police employees by Department of Defense); Capua v. City of Plainfield, 643 F.Supp. 1507 (D.N.J.1986) (reasonable suspicion needed to test fire fighters); Fraternal Order of Police v. City of Newark, 216 N.J.Super. 461, 524 A.2d 430 (App.Div.1987) (reasonable suspicion required for testing of police officers); City of Palm Bay v. Bauman, 475 So.2d 1322 (Fla.Dist.Ct.App.1985) (reasonable suspicion needed to test police or fire fighters).
 
 
 31
 We believe there is a central flaw in the reasoning of many of the drug testing opinions we have read. We are unconvinced that the amount of regulation in a given employment context, or analogies to administrative searches, should be the basis for determining whether the individual employee's privacy interests is less weighty than the government's asserted interests. See, e.g., Shoemaker: 795 F.2d at 1142 ("the administrative search exception applies to warrantless breath and urine testing of employees in the heavily regulated horseracing industry." The court goes on to add that its holding "applies only to breathalyzer and urine sampling of voluntary participants in a highly regulated industry.") National Ass'n of Air Traffic Specialists, Slip op. at 34 ("If horse racing is recognized as a closely or pervasively regulated activity, then aviation activities and the aviation industry are as much or more closely regulated."); Von Raab, 816 F.2d at 179-180 (search of customs service officials permissible in part because of the "administrative nature of the search" and by "analogy to regulated industry."); and Local 318 at 786, 2 IER Cases at 970 ("While police officers certainly operate within a framework of regulatory controls, a police officer does not carry out his duties in the same 'intensely regulated' atmosphere as that experienced by a jockey participating in horse racing.") We reject the argument that solely because a given employment industry is heavily regulated, such as air traffic control or horse racing, that it follows that mandatory urinalyses may be condoned in the absence of individualized suspicion. Similarly, we reject the argument that because an industry is not regulated, such as police and fire patrols, that it necessarily follows that a standard that does not require reasonable suspicion is unconstitutional. Such an approach is simplistic and intellectually indefensible.
 
 
 32
 To allow widespread mandatory drug testing of individuals by analogizing it to the relaxed standards governing the less intrusive searches of places allowed under the administrative search warrant exception fundamentally misapprehends that doctrine. That doctrine, which was created in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), deals with an area where there is a "long history of judicial and public acceptance" of liberal standards in weighing the need for periodic inspection of premises for compliance with municipal codes. 387 U.S. at 537, 87 S.Ct. at 1735. See Frank v. Maryland, 359 U.S. 360, 367-71, 79 S.Ct. 804, 809-11, 3 L.Ed.2d 877 (1959). Furthermore, this doctrine, with its relaxed standard for inspection warrants, was allowed by the Supreme Court "because the inspections are [not] personal in nature ... they involve a relatively limited invasion of the urban citizen's privacy." 387 U.S. at 537, 87 S.Ct. at 1735 (emphasis added). This conclusion of the Supreme Court was amply supported:
 
 
 33
 Time and experience have forcefully taught that the power to inspect dwelling places, either as a matter of systematic area-by-area search or, as here, to treat a specific problem, is of indispensable importance to the maintenance of community health; a power that would be greatly hobbled by the blanket requirement of the safeguards necessary for a search of evidence of criminal acts. The need for preventive action is great, and city after city has seen this need and granted the power of inspection to its health officials; and these inspections are apparently welcomed by all but an insignificant few. Certainly, the nature of our society has not vitiated the need for inspections first thought necessary 158 years ago, nor has experience revealed any abuse or inroad on freedom in meeting this need by means that history and dominant public opinion have sanctioned. 359 U.S. at 372, 79 S.Ct. at 811-12.
 
 
 34
 Given the origins of the administrative search warrant exception, it seems incredible that the argument in favor of mandatory drug testing should be based on this doctrine. Unlike the situation addressed in Camara, mandatory drug testing is extremely personal in nature; few other searches could be more personal in nature. Furthermore, it is not clear that time has so forcefully taught the need for mandatory drug testing. Finally, the doctrine is inapposite as those who would conduct a search of buildings must still secure a warrant.
 
 
 35
 Rather than focus on the amount of regulation in the industry or work force, we believe it is necessary to understand why a particular industry is regulated and why the drug tests have been initiated. We do not accept the justification of allowing drug testing in a regulated industry without reasonable suspicion when the testing pursues a policy or interest different from the regulations. For example, a particular industry, such as public utilities, may be regulated for the purpose of promoting economic efficiency because of a lack of competition. It would be nonsensical to then conclude that mandatory urinalyses that are not designed and do not further the purposes pursued by the regulations are nevertheless relieved of constitutional scrutiny because of those regulations. Furthermore, the existence or nonexistence of a regulatory framework does not necessarily indicate that employees in a given employment sector have a greater or lesser expectation of privacy.
 
 
 36
 We believe there must be a focus on the particular nature of the employment sector to be tested. More specifically, there must be an inquiry into the harm that will result to society if mandatory drug tests are not allowed in that industry. The higher the cost and the more irretrievable the loss, the stronger the argument for finding reasonable the initiation of a drug testing program. We believe society has a right to protect itself from the infliction of irretrievable catastrophic losses. When determining whether any search is reasonable, there must be consideration of the benefits that inure from the exercise of that search. As the harm to society of not conducting the search of an individual increases to potentially catastrophic levels, the less willing is society to consider reasonable that individual's subjective expectations of privacy.
 
 
 37
 Not only must there be an analysis of the potential harm to society of an impaired employee in a given sector, but there must also be a determination of the extent to which mandatory drug testing will decrease the risk of such harm being imposed on society. Implicit in this analysis, of course, is the question of how incompatible is job performance in that sector with the usage of illegal drugs. Also implicit in this inquiry is the question of how often a drug test will register positive though the tested employee is not in fact impaired on the job.
 
 
 38
 In the case of fire fighters, the harm to society of a fire fighter being impaired may be significant. Furthermore, those losses, especially when it is in the form of lost lives, are irretrievable. Nevertheless, it would appear that the likelihood of enormous losses being imposed on society because of an impaired fire fighter is significantly lower than with impaired air traffic controllers and nuclear plant employees who literally hold thousands of lives in their hands every day. See National Ass'n of Air Traffic Specialists v. Dole, supra, and Local 318. That does not describe the typical day of a fire fighter.
 
 
 39
 This difference in the potential harm to society becomes even more significant when a determination is made of the extent to which drug tests will decrease the risk to society. Because there was not any evidence of a widespread or significant drug problem within the City of Chattanooga's Fire Department, the potential gains to society of initiating mandatory drug testing are significantly lower than would have been the case if there had been evidence of a systemic drug problem. Thus, the probability of detecting an impaired employee must be considered as well as the benefit to society of removing such an employee. As the Supreme Court said in New Jersey v. T.L.O., "reasonable grounds must [exist] for suspecting that the search will turn up evidence" of work-related drug use. 469 U.S. at 342, 105 S.Ct. at 743. This is especially critical when the loss to society of failing to detect an impaired employee is likely not to be so great.
 
 
 40
 Thus, we believe there is a continuum of employment categories that are defined by the degree of suspicion that a drug problem exists and the potential harm to society of an impaired employee operating in that employment sector. When determining, then, whether a mandatory drug search is "reasonable," we believe that, as the costs to society of an impaired employee increase, the requisite level of suspicion that a drug problem exists decreases. The lower the potential harm to society, the more suspicion needed. This view is reinforced by the observation that if the potential harm to society of an impaired public employee is likely to be very large, society will be less willing to consider reasonable that employee's subjective expectations of privacy. Of course, this suspicion must be based in good faith and grounded in objective evidence. In the overwhelming number of jobs where an impaired employee is not in a position to impose significant, irretrievable losses on society, we do not believe a mandatory drug test would be reasonable absent individualized reasonable suspicion. In Rushton v. Neb. Pub. Power Dist., 844 F.2d 562 (8th Cir.1988), the court there also recognized, in upholding the mandatory testing of nuclear plant employees, that in certain circumstances the state's interest may be so great that individualized suspicion will not be required.
 
 
 41
 In the case of the mandatory drug testing program at issue here, we believe that, while fire fighters may at times be in a position where significant losses could be imposed on society because of drug impairment, it is clearly not of the same magnitude as exists with air traffic controllers or nuclear plant operators, for example. Accordingly, for a mandatory drug test of fire fighters to be reasonable, there must be some evidence of a significant department-wide drug problem or individualized suspicion. No evidence of such a problem exists here. The low probability of a given test being positive, in combination with the moderate benefits to society of a positive test result, do not justify a restriction of the constitutional rights of the City of Chattanooga's fire fighters.
 
 
 42
 This holding is reinforced by our perception of an inherent flaw in this and any similar testing program. Simply stated, a mandatory drug test does not in fact measure impairment. Rather, it measures whether the tested employee has in the recent past used illegal drugs. There is insignificant evidence in this record for us to determine the extent to which a positive test result equals a finding of impairment. We suspect, however, that as with alcohol tests, there exists a level of nanograms per millileter where it may be presumed that an employee with such a level is impaired. What that level is we do not know. We do note that there may be jobs where the very fact that the employee has used illegal drugs during the course of his or her employment indicates impairment. See, e.g., Penny v. City of Chattanooga, 846 F.2d 1563 (6th Cir.1988). This question of the correlation between positive test results and impairment is particularly important here where the fire fighters who test positive are being cited for violating department rule Sec. 38, General Conduct 38.11 which prohibits any member from reporting to duty "under the influence of any ... drugs ... or render[ing] himself unfit to finally perform his duties."
 
 
 43
 Because we do not find there was significant justification for initiating the drug test at issue here, we do not need to analyze "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " T.L.O., 469 U.S. at 341, 105 S.Ct. at 743 (quoting Terry, 392 U.S. at 20, 88 S.Ct. at 1879). We do note, as we did earlier, that problems of underinclusiveness are rarely problems of constitutional magnitude. We also note that while the fact that the donation of urinary samples was to be observed was not relevant in determining whether a "search" for fourth amendment purposes took place, we do believe that this fact does increase the burden on the employer to justify the testing. An unobserved urine test is clearly less intrusive than one that is observed. We believe there may be better ways to guard against employee efforts to provide misleading or adulterated urinary samples. For instance, temperature tests of the urine might guard against the donation of old urine specimens, chemical tests should be able to determine the presence of foreign substances such as soap or vinegar in the urine sample, and pat downs of employees may even be preferable to observation, as pat downs seem to be less intrusive on employees' reasonable expectations of privacy.
 
 
 44
 Finally, we join the District of Columbia Circuit in holding that a search otherwise unreasonable does not become constitutionally palatable because it is attached as a condition of employment. National Fed'n of Fed. Employees v. Weinberger, 818 F.2d at 943. We do not believe the government should be allowed to accomplish indirectly, absent compelling reasons, what it cannot accomplish directly under the Constitution. That is the central tenet of the doctrine of unconstitutional conditions, a doctrine increasingly used today to limit the conditioning of government jobs and benefits upon the waiver of constitutional rights. See Kreimer, Allocational Sanctions: The Problem of Negative Rights in a Positive State, 132 U.Pa.L.Rev. 1293 (1984); and Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). If the government could freely condition its many jobs and countless other benefits on the waiver of constitutional rights, then the promises of the Constitution and Bill of Rights would be largely hollow and symbolic.[1] Such conditions must be recognized for what they are: constitutionally unauthorized enlargements of government power. Constitutional conditions that restrict the status quo of constitutional liberty enjoyed by citizens, and which do not significantly advance legitimate government interests, should be treated no differently than any direct infringement of constitutional rights.
 
 
 45
 The issue presented in this case explores the line between two critical societal concerns. On the one hand there is the compelling need to fashion an effective response to the problem of illegal drugs that would undermine the public workplace and the ability of public servants to respond in times of emergency. On the other hand there is the compelling right of all citizens under the U.S. Constitution to be free from unreasonable searches and seizures. While we strongly support the City of Chattanooga's concerns of drug-related impairment in its Fire Department, we believe that our holding today affirms the fundamental principle that all citizens, including those employed in the public sector, enjoy constitutional protection. The guaranties of protection afforded by the Constitution are most vital where the temptations to abandon them in favor of attractive policy goals are most seductive.
 
 
 46
 Accordingly, the decision of the district court enjoining the City of Chattanooga from initiating mandatory drug testing of fire fighters as violative of the fire fighters fourth amendment rights is affirmed.
 
 
 47
 JOHNSTONE, Chief District Judge, concurring.
 
 
 48
 I concur with the holding in Judge Martin's opinion. However, my understanding of the Supreme Court's ruling in O'Connor v. Ortega, --- U.S. ----, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) requires me to employ a narrower analysis than Judge Martin uses, and to limit my analysis to the specific facts of this case to resolve this matter. Thus I write separately.
 
 I.
 
 49
 The fourth amendment requires that a warrant must be issued upon probable cause before a search may be conducted. The warrant and probable cause requirements constitute a standard of reasonableness which courts may not abandon absent "exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 749, 83 L.Ed.2d 720 (1985). In O'Connor v. Ortega, --- U.S. ----, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), the Supreme Court held that the warrant requirement is inapplicable to a work place search by a state-run hospital because
 
 
 50
 requiring an employer to obtain a warrant whenever the employer wished to enter an employee's office, desk, or file cabinets for a work-related purpose would seriously disrupt the routine conduct of business and would be unduly burdensome. Imposing unwieldy warrant procedures in such cases upon supervisors, who would otherwise have no reason to be familiar with such procedures, is simply unreasonable.
 
 
 51
 O'Connor v. Ortega 107 S.Ct. at 1500-1501. The same reasoning holds in this case. It would be against the dictates of common sense to require the fire department to obtain a warrant for a urinalysis test when they had a valid reason to test an individual. The fire department is not in the business of investigating the violation of criminal laws, and obtaining a warrant is generally, though not completely, beyond the business routine of the department.
 
 II.
 
 52
 Since the warrant requirement is inapplicable, it is necessary to establish the proper standard of reasonableness to be applied in this case. O'Connor v. Ortega, 107 S.Ct. 1492 (1987) instructed us that determining the standard of reasonableness applicable to a particular class of searches requires "balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id. at 1499. In applying this balancing test, it is of paramount importance to identify what interests are at stake and therefore what purpose is served by the search in question. See id. at 1500. Cf. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968); Michigan v. Tyler, 436 U.S. 499, 98 S.Ct. 1942, 1950-51, 56 L.Ed.2d 486 (1978).
 
 
 53
 The individual interest at stake here is the right of everyone "to be secure in his person," which includes every individual's right to privacy, personal integrity, security and dignity, free from government intrusion. U.S. Const., Amend. 4. Individual privacy and dignity are basic to a free society, Winston v. Lee, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), and are protected by the Fourth Amendment. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). In the context of this case, these rights translate into a fundamental constitutional interest on the part of the Chattanooga fire fighters to be free from governmentally compelled urinalysis.
 
 
 54
 Juxtaposed to the firemen's interest is the City of Chattanooga's espoused interest in "the efficient and proper operation of the work place." Even if we accede to the City's statement of its interests, it does not appear that efficiency is the interest primarily relied upon by the City to justify its actions. The record in this case reveals that the City is at least as concerned with the danger to the populace and to other fire fighters which might be caused by impaired fire fighters performing their duty as it is with the efficient administration of the work place. Of course, no bright line can be drawn between the City of Chattanooga's interest in safety and its interest in efficient administration. It is important therefore to recognize that the City of Chattanooga has a valid interest both in keeping its employees and the public safe from drug-using firemen who are impaired and in the efficient operation of its work place.
 
 
 55
 These are the interests that we must balance under the fourth amendment.
 
 III.
 
 56
 In applying the fourth amendment balancing test, consideration must be given to "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979); New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 742-43, 83 L.Ed.2d 720 (1985).
 
 A.
 
 57
 The search in this case is a serious intrusion upon the sanctity of any individual. I join Judge Martin in recognizing the legitimate expectation of privacy which the fire fighters have in the act of urinating and agree that their expectations are in no way undermined by the fact that they may at times voluntarily urinate in the presence of other fire fighters. Consequently, compelling the donation of a sample of urine for urinalysis, under observation, is by its very nature a serious intrusion into the fire fighter's privacy.
 
 
 58
 More important to my analysis, however, is the individual fire fighter's expectations of privacy in the facts which analysis of his urine sample may reveal. As Judge Martin notes, urinalysis may reveal drug use, disease, alcohol use, pregnancy, and a myriad of other physiological conditions and infirmities which many tested individuals would ordinarily expect to keep private. Discovery of the individual's present conditions often necessarily reveals the past actions which caused those conditions, just as though the testing party had been present and watching those earlier actions. There is no way for the individual to protect his privacy from this intrusion for unlike the search of a person's files, desks, lockers or handbags, the individual cannot simply leave the private facts his body contains at home to protect his privacy. See O'Connor, supra, 107 S.Ct. at 1502.
 
 
 59
 In sum, the urinalysis test in this case is seriously intrusive as to the manner in which it must be conducted and in the scope of information it reveals. Consequently, there must be some highly substantial justification for the City's actions to make the imposition of urinalysis reasonable. See United States v. Afanador, 567 F.2d 1325, 1328 (5th Cir.1978).
 
 B.
 
 60
 The justification for initiating a search is a matter grounded in the concrete factual circumstances surrounding each search. The initial justification for a warrantless search may not be based upon a mere hunch. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 1880-84, 20 L.Ed.2d 889 (1968). It must be begun and conducted only upon the basis of objective, articulable facts, and reasonable inferences derived from such facts, which indicate that an individual is acting or has acted in such a way as to violate the government's purported interest. See McDonell v. Hunter, 809 F.2d 1302, 1307 (8th Cir.1987).
 
 
 61
 In the present case, the city has an interest in the safe and effective administration of its laws. We must therefore examine the facts justifying the initiation of urinalysis testing in this case in light of those interests. In this regard, Judge Martin concludes that for a mandatory drug test of fire fighters to be reasonable, there must be "some evidence of a significant department-wide drug problem or individualized suspicion." He then finds that there was not a significant justification for initiating the drug test at issue here.
 
 
 62
 I agree with Judge Martin's ultimate conclusion. For mandatory urinalysis of individual fire fighters to be reasonable, there must be some objective, articulable, specific facts which would support a reasonable suspicion that an individual is using or has used substances which impair his ability to safely and effectively perform his duty. In the present case there was no objective evidence in the record of a systemic drug problem in the fire department or that any individual fire fighter to be tested in 1987 might have a drug problem. Consequently there are no specific, articulable, objective facts which would justify the imposition of warrantless, mandatory urinalysis of the fire fighters in this case.
 
 
 63
 Although I agree with Judge Martin's conclusion, my analysis differs in that I do not consider the "potential," "significant" or "irretrievable harm" which might be visited upon society by drug-using public employees to be proper justification for a search. Considerations of potential, general social damage might be relevant in determining whether society would recognize an individual's expectations of privacy as reasonable. However, I do not find it necessary to add this indeterminate factor into the fourth amendment calculus set forth in O'Connor v. Ortega to resolve this case.
 
 
 64
 For the foregoing reasons I concur in the result reached by Judge Martin.
 
 RALPH B. GUY, Jr., Circuit Judge, dissenting.[1]
 
 65
 If I were persuaded to join those courts which have concluded that mandatory drug testing of public employees offends the fourth amendment, I would gladly join in Judge Martin's well written opinion. Indeed, it would be the easy way out to concur since the courts have produced a plethora of conflicting opinions on this issue and the Supreme Court has now taken the matter for resolution.[2] However, I remain convinced that all of the approaches to this problem have not been fully explored and that the issue has not been defined once and for all.
 
 I.
 
 66
 The discussion of this issue, at least for me, starts with the reality that constitutional restrictions do not apply equally to all. Private employers who want to institute a drug testing program may do so and need not concern themselves with the fourth amendment.[3] Public employers, on the other hand, find their attempts at drug testing constrained by the strictures of the fourth amendment--or at least, so goes the conventional wisdom. My initial premise is that although the fourth amendment is a restriction on the action of public officials, it is not necessarily applicable to mandatory drug testing of public employees. As will soon be apparent, the word "necessarily" looms large in my analysis.
 
 
 67
 The typical fourth amendment analysis in the drug testing cases starts off with an inquiry as to whether the individual has a "reasonable expectation of privacy." See, e.g., Von RAAB, 816 F.2d at 175 (citing United States v. Jacobson, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). Since we are talking about drug testing of urine samples, the analysis usually concludes quickly that the act of urination is a very private one and thus the "reasonable expectation of privacy" test is satisfied.[4] I submit that the conclusion reached as to privacy concerns does not answer the fourth amendment question. "[T]he Fourth Amendment cannot be translated into a general constitutional 'right to privacy.' " Katz v. United States, 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967). "Virtually every governmental action interferes with personal privacy to some degree. The question in each case is whether that interference violates a command of the United States Constitution." Id. at 350 n. 5, 88 S.Ct. at 510 n. 5. In order to find out if "a command of the United States Constitution" is offended by a search, one must first determine if there has been a search. Although the majority of drug testing cases have stated or assumed that a search is involved, I suggest that that is not necessarily the case. If an employer without consent were to remove urine with a catheter from the bodies of employees, just as the blood sample was removed by a needle in Schmerber,[5] I would agree that this is a search. However, if the employee is asked to donate a urine sample and surrender it to the employer for analysis, is that a search? I would conclude it is not for the simplest of reasons. It does not comport with any commonly accepted definition of the word "search." I fully realize that a search does not necessarily require a physical intrusion. I am also well aware of the familiar refrain quoted by the majority that "the Fourth Amendment protects people, not places."[6] Lovvorn v. City of Chattanooga, 846 F.2d 1539, 1542 (quoting Katz, 389 U.S. at 351, 88 S.Ct. at 511). However, the very next line from Katz reads: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." 389 U.S. at 351, 88 S.Ct. at 511. To illustrate: If a public employer were to go to a public employee's house and rummage without permission through a desk and take the employee's tax returns, this would clearly be a search. But, if that same employer asks the employee to bring in his tax returns and the employee does, I submit that is not a search. In fairness, it must be stated that a compelled compliance may turn a voluntary act into an involuntary one and thus implicate the fourth amendment. It is thus necessary to analyze whether the surrender of a urine sample by an employee to the employer is a voluntary act. I suggest that it is for the reason that the public employee is free to refuse the request. To be sure, adverse consequences may follow, even including loss of employment, but can that turn a non-search into a search?The Supreme Court, on at least one occasion, has answered a similar question in the negative. Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), addressed this issue of "refusal with consequences" in a related context. The facts in Wyman may be summarized by a brief quote from the case:
 
 
 68
 The District Court majority held that a mother receiving AFDC relief may refuse, without forfeiting her right to that relief, the periodic home visit which the cited New York statutes and regulations prescribe as a condition for the continuance of assistance under the program. The beneficiary's thesis, and that of the District Court majority, is that home visitation is a search and, when not consented to or when not supported by a warrant based on probable cause, violates the beneficiary's Fourth and Fourteenth Amendment rights.
 
 
 69
 Id. at 312-13, 91 S.Ct. at 383.
 
 
 70
 The Supreme Court, speaking through Justice Blackmun, reversed the district court. Both the language and the reasoning are interesting.[7] After first discussing and approving of the district court's "a man's home is his castle" approach, the Court stated:
 
 
 71
 This natural and quite proper protective attitude, however, is not a factor in this case, for the seemingly obvious and simple reason that we are not concerned here with any search by the New York social service agency in the Fourth Amendment meaning of that term. It is true that the governing statute and regulations appear to make mandatory the initial home visit and the subsequent periodic "contacts" (which may include home visits) for the inception and continuance of aid. It is also true that the caseworker's posture in the home visit is perhaps, in a sense, both rehabilitative and investigative. But this latter aspect, we think, is given too broad a character and far more emphasis than it deserves if it is equated with a search in the traditional criminal law context. We note, too, that the visitation in itself is not forced or compelled, and that the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and there is no search.
 
 
 72
 Wyman, 400 U.S. at 317-18, 91 S.Ct. at 386. In Wyman the right to refuse entry was equated with consent to enter if, in fact, refusal did not occur. In discussing the consequences of a refusal, the Supreme Court said the "aid [which may be all the family has to live on] merely ceases." Is not the employee who refuses to submit to drug testing in an analogous position?[8] Under the Wyman logic, the surrender of the sample to the employer would not constitute a search any more than did the home visit consented to by the ADFC parent.
 
 
 73
 In suggesting that no fourth amendment search is involved in the donation of a urine sample under these circumstances, it is necessary to deal also with the "second search" aspect of the procedure. If one were willing to conclude that the donation of a sample under conditions that gave appropriate consideration to modesty concerns is not a search, is not the chemical analysis of the sample itself a search? I think this question has to be answered "yes," but I would dispose of it in the way the Court did in Wyman by indicating it is not the kind of search that is within the purview of the fourth amendment. The concerns arising from the so-called second search are really fifth amendment concerns. Since the testing programs here are constructed so that criminal prosecution concerns are not implicated, there is no fifth amendment problem.[9]
 
 
 74
 Here, the employee, in the language of Katz, "knowingly exposes" the urine sample to his employer. Of this there can be no doubt. The real question again is the interplay between voluntary and involuntary "exposure" within the context of the fourth amendment.
 
 
 75
 The fourth amendment does address, but does not resolve this issue. The classic type of involuntary exposure anticipated by the fourth amendment is that compelled by a warrant. But there are many situations in which a person may be legally subjected to an involuntary search even in the absence of a warrant. The exceptions to the warrant requirement are numerous. There is, to name but a few: the "automobile exception," Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); "search incident to arrest," Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); and "inventory searches," Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).[10] Whether these exceptions have any common thread or not is debatable, but one way of analyzing them is to note that in each exception there is something about the relationship of the searcher to the searchee or the purpose of the search that calls for a less stringent application of the fourth amendment. For example, the Chimel search is for the purpose of protecting the officer. It is not (at least ostensibly) to gather evidence. Similarly, the inventory search is to protect the police against spurious claims of missing property. Both the search incident to arrest and inventory searches are prophylactic rather than investigative. Rather than viewing these types of searches as exceptions to the warrant requirement, the courts could have simply held that they are not the kind of searches implicated by the fourth amendment (the Wyman approach). However, since they are both so clearly a "search" under any usual definition of that word, it probably makes more sense to think of them as exceptions. Where we are not dealing with a typical search, however, as in drug testing, there is no reason why one cannot apply the logic without the label. Since the purpose of drug testing is other than investigative, it should merit the same exemption other prophylactic intrusions have received.[11]
 
 
 76
 I see no principled reason why public employee drug testing cannot be analyzed in the same manner. For example, when a police officer is asked to qualify periodically on the firing range with his firearm in order to remain on duty, the purpose is not primarily to find non-qualifying officers but, rather, to ensure that the officers will practice adequately so that they can pass the test. The same thing is true of drug testing. Undoubtedly Commissioner Kennedy would prefer that every public safety officer test negative.[12] The threat of periodic drug testing, however, is the motivator to keep public safety officers drug free.[13]
 
 
 77
 In this regard, I want to return for a moment to that part of the Wyman analysis where the Court points out that although "one's Fourth Amendment protection subsists apart from his being suspected of criminal behavior ... that we are not concerned here with any search ... in the Fourth Amendment meaning of the term." 400 U.S. at 317, 91 S.Ct. at 385-86. In other words, there are "searches" and then again there are "Fourth Amendment searches." Although the Wyman opinion does not suggest how we distinguish between the two, I would hope that common sense would be a large component in any test that evolves. The City in seeking these urine samples is not acting pursuant to its police powers, nor is it acting in furtherance of any type of criminal investigation or prosecution. Rather, the City's proposed drug testing program arises from a number of other considerations that do not involve the fourth amendment. First, the City is acting in its capacity as an employer and should to the greatest degree possible be no less constrained than a private employer would be in similar circumstances. Second, it has the legal responsibility for the safety of its citizens and has not only a right but an obligation to protect its citizens from the misdeeds, negligent or otherwise, of its employees. Third, government stands as a role model of sorts and should be able to project an appropriate image to its citizens. I see nothing wrong with a city wanting to demonstrate to its residents that it has a drug free work force. Furthermore, since government at all levels is the largest single employer in this country, I see nothing wrong with its sending a message that future potential government employees must be and remain drug free.
 
 
 78
 On the basis of the record made in this case, the effects of drug usage on performance are demonstrated to be significant and yet the effects may not be readily detectable on a day-to-day basis. It is not the totally disabled we are talking about, but the slightly impaired. Impairment does not respect the public/private sector dichotomy that appears to exist in this area of the law. The public wants and rightfully expects the policeman's finger on the trigger to be as steady as the jockey's hand on the bridle.[14] Unfortunately, as yet, there is no test for impaired judgment other than an after-the-fact analysis. Therefore, the City rightfully seeks to reduce those factors which contribute to impairment.
 
 II.
 
 79
 Assuming arguendo that mandatory drug testing of public safety workers by means of urinalysis is a search within the meaning of the fourth amendment, I believe that such a search is not unreasonable--even absent individualized suspicion of drug use. Therefore, I would hold that the City of Chattanooga's proposed plan to test its public safety employees for drug use does not violate the fourth amendment's prohibition against unreasonable searches.
 
 
 80
 Many of the recent cases which have struck down drug testing programs have cited to the recent Supreme Court decision in O'Connor v. Ortega, 480 U.S. ----, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). Although I do not find that O'Connor dictates the result in a drug testing case, if one concedes that the chemical analysis of the urine sample is a search, then O'Connor becomes relevant to the issue of whether such a search is proscribed by the fourth amendment. Accordingly, I begin my analysis of the reasonableness issue with a brief review of the O'Connor decision.
 
 
 81
 In O'Connor, the Court was confronted with the issue of whether administrators of a state hospital could constitutionally search the office, desk, and file drawers of a doctor who was on leave of absence pending the investigation of alleged misconduct. Justice O'Connor, writing for a plurality of the Court,[15] found that Dr. Ortega had a reasonable expectation of privacy in his office, desk, and file cabinets and, therefore, a search of those areas by his government employer implicated the fourth amendment. 107 S.Ct. at 1498-99. The plurality opinion then went on to discuss whether or not the search was unreasonable. The plurality adopted a balancing test to determine the reasonableness of the search:
 
 
 82
 A determination of the standard of reasonableness applicable to a particular class of searches requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." In the case of searches conducted by a public employer, we must balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control and the efficient operation of the work place.
 
 
 83
 O'Connor, 107 S.Ct. at 1499 (citations omitted).
 
 
 84
 Applying this balancing test, the plurality concluded that it would be "unworkable" and "unduly burdensome" to require a public employer to obtain a warrant prior to entering an employee's office or desk. 107 S.Ct. at 1500. The plurality also concluded that it would be an "intolerable burden" to impose a "probable cause" requirement on public employers who seek to gain unauthorized access to an employee's office "for legitimate work-related, non-investigatory intrusions [e.g., locate a missing file] as well as investigations of work related misconduct." 107 S.Ct. at 1502 (emphasis added). The plurality, however, stopped short of deciding whether or not "individualized suspicion" was necessary to justify the search. 107 S.Ct. at 1503 ("Because the petitioners had an 'individualized suspicion' of misconduct by Dr. Ortega, we need not decide whether individualized suspicion is an essential element of the standard of reasonableness that we adopt today.")
 
 
 85
 After describing its "standard of reasonableness," the Court concluded that remand was appropriate for further factual development.
 
 
 86
 In his concurring opinion, Justice Scalia wrote separately to emphasize his view that the fourth amendment is implicated a fortiori, because the search of the employee's personal office was conducted by the government, even though it was acting in its capacity as an employer rather than pursuant to its police powers. 107 S.Ct. at 1505 (Scalia, J., concurring). According to Justice Scalia, the government's status as an employer was relevant, however, to the issue of whether the search was reasonable. Therefore, Justice Scalia stated:
 
 
 87
 I would hold that government searches to retrieve work-related materials or to investigate violations of workplace rules--searches of the sort that are regarded as reasonable and normal in the private employer context--do not violate the Fourth Amendment.
 
 
 88
 107 S.Ct. at 1506 (Scalia, J., concurring). Justice Scalia agreed with the plurality that the issue could not be resolved on summary judgment due to the conflicting evidence.
 
 
 89
 The foregoing O'Connor analysis highlights two important points. First, the plurality opinion clearly left unresolved the question of whether public employers can conduct searches absent individualized suspicion.[16] Second, both the plurality and the concurring opinion emphasized the weight which must be given to the government's status as an employer when applying the balancing test used to determine the reasonableness of the search. It is primarily this second factor which leads me to conclude that it is not unreasonable for the City of Chattanooga to test its public safety personnel for drug use.
 
 
 90
 In its opinion in this case, the majority purports to apply the balancing test set forth in O'Connor v. Ortega, i.e., weighing the privacy interests of the individual employees against "the governmental interest in the efficient and proper operation of the workplace." Lovvorn, 846 F.2d at 1544 (quoting O'Connor, --- U.S. at ----, 107 S.Ct. at 1501, 94 L.Ed.2d at 727); Penny, 846 F. at 1566. On one side of the scale, the majority places the privacy interest in both the act of urination and in the "physiological secrets" which the urine contains. As previously noted, I am not particularly troubled by the "embarrassment factor" implicated by the fact that the urine donation must be observed in order to ensure the accuracy of the urinalysis test.[17] Although this is a factor which may be given some weight, I do not believe that it is determinative. I believe that the chemical analysis of the urine which reveals information not otherwise available, is the more significant of the two concerns.
 
 
 91
 My disagreement with the majority, however, focuses on the other side of the scale, i.e., the government's interest in testing. In both Lovvorn and Penny, the majority concentrates almost exclusively on the general threat to public safety posed by emergency workers who attempt to perform their duties while under the debilitating influences of controlled substances. The majority correctly notes that "the use of such substances, such as marijuana, can adversely affect one's perception, decisionmaking time, short-term memory, motor skills, and judgment." Lovvorn, at 1544. See also Penny, at 1565. There is no question that this is an important concern which the courts should take into consideration when deciding whether mandatory drug testing is reasonable.[18] I also agree with the majority that all three categories of employees who would be subject to testing (firefighters, police officers, and paramedics) are engaged in hazardous activities and are often called upon to respond to life threatening emergencies. I would also add that these types of workers are frequently required to operate emergency vehicles at high speeds, thereby creating an even greater risk to themselves and to the public if their performance is impaired by the use of drugs. Moreover, I am also in agreement with the majority's conclusion that the government's interest in imposing mandatory testing should be given more weight in cases where the potential harm to society is "catastrophic" or "irretrievable." Lovvorn, at 1546; Penny, at 1566.
 
 
 92
 My problem with the majority's treatment of this issue is that it focuses exclusively on the public safety concern as the sole justification for testing public employees for drug use. The majority envisions a "continuum of employment categories" defined by the potential harm which would result if a particular type of employee failed to properly perform his or her duties. Lovvorn, at 1547. Thus, the majority apparently concedes that mandatory testing--even absent individualized suspicion--may be reasonable in certain circumstances, e.g., air-traffic controllers or nuclear power plant workers. In addition, the majority would apparently allow testing of other categories, such as police officers and firefighters, where there is "some evidence of a significant department-wide problem." Lovvorn, at 1547.[19]
 
 
 93
 The analysis proposed by the majority is logical and might be appropriate if we were considering the constitutionality of an ordinance passed by the City of Chattanooga pursuant to its general police powers to provide for the safety and welfare of its citizenry. In fact, several of the drug testing cases have involved attempts by the government to regulate private sector employees.[20] In the cases before us, however, plaintiffs challenge the authority of Chattanooga to test its own employees. Both the plurality and the concurring opinions in O'Connor v. Ortega highlight the fundamental importance of the fact that the government was acting as an employer. Since Chattanooga is acting pursuant to its role as an employer, there are several additional factors which must be placed on the scales when determining whether the testing is reasonable.
 
 
 94
 First, a corollary to the public safety issue discussed by the majority is the corresponding liability costs associated with any accident resulting from drug use by emergency workers. Since the Supreme Court's decision in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), municipalities have been subject to suit under 42 U.S.C. Sec. 1983. It is common knowledge that municipalities across the country are facing financial difficulties in light of the current "liability crisis." Thus, in addition to the general interests in protecting the lives and safety of its citizens and employees, the City also has a strong financial interest in taking affirmative measures designed to reduce the risk of accidents and related injuries.
 
 
 95
 Public employers must also consider the negative image created by public servants who buy and use drugs. The City of Chattanooga certainly has a legitimate interest in assuring its citizens that the public servants who are responsible for protecting them are not drug abusers. This problem is especially acute with respect to the potential for drug use among the officers of the Chattanooga Police Department. Like firefighters and paramedics, police officers are often called upon to rapidly respond to life-threatening emergencies. Moreover, police officers are required to carry weapons and are authorized to use deadly force in certain circumstances. Police officers often confront threatening situations which call for the utmost care in the rapid exercise of sound judgment. Therefore, the City has a strong interest in assuring that the officers are always at the peak of their physical and mental abilities. Perhaps even more importantly, police officers are sworn to uphold and enforce the laws, including the laws which prohibit the sale, use or possession of certain illicit drugs.[21] By using illegal drugs, police officers expose themselves to compromise, thereby seriously jeopardizing their effectiveness as law enforcement agents. Therefore, the very act of drug use by a police officer has a significant adverse effect on job performance, in addition to any physiological side effects which may occur.[22]
 
 
 96
 Third, the City of Chattanooga has the same need for "supervision, control and the efficient operation of the work place" as does any other employer, public or private. As noted by the Supreme Court in O'Connor:
 
 
 97
 Public employers have an interest in ensuring that their agencies operate in an effective and efficient manner, and the work of these agencies inevitably suffers from the inefficiency, incompetence, mismanagement or other work-related misfeasance of its employees. Indeed, in many cases, public employees are entrusted with tremendous responsibility, and the consequences of their misconduct or incompetence to both the agency and the public interest can be severe. In contrast to law enforcement officials, therefore, public employers are not enforcers of the criminal law; instead, public employers have a direct and overriding interest in ensuring that the work of the agency is conducted in a proper and efficient manner.
 
 
 98
 107 S.Ct. at 1502.
 
 
 99
 Given the nature of the hazardous and vital duties performed by public safety workers, it is natural to focus attention on the more dramatic types of activities when analyzing the potential adverse effects of drug use on job performance. This type of narrow analysis, however, ignores the adverse impact that drug use might have on the more mundane day-to-day duties of police officers and firefighters. Public safety workers are often required to perform a variety of administrative tasks such as filing reports and maintaining logs and records. Although these duties may be less glamorous than fighting fires, rescuing accident victims or arresting criminals, they are nonetheless essential to the continuing operations of the fire and police departments. Employees who are under the influence of drugs are certainly less capable of performing these types of administrative functions in a proficient and expeditious manner.[23] Moreover, it is well established that there is a strong correlation between drug and alcohol abuse and absenteeism, tardiness and chronic medical problems.[24] All of these manifestations of employee drug abuse problems lead to increased costs for the employer, regardless of whether the work is being performed in the private or public sector.
 
 
 100
 Because of the toll which drug abuse takes on productivity and efficiency, drug testing has become increasingly common among companies in the private sector.[25] Although private employers generally are not subject to the strictures of the fourth amendment, I agree with the general principle expressed by Justice Scalia in his concurring opinion in O'Connor that "searches of the sort that are regarded as reasonable and normal in the private employer context--do not violate the Fourth Amendment." 107 S.Ct. at 1506 (Scalia, J., concurring). To me it seems anomalous that a privately owned security company can test its employees for drug use, whereas the City of Chattanooga is not allowed to test its emergency personnel absent individualized suspicion of drug use.
 
 
 101
 Essentially, the majority concludes that the mandatory testing of police officers and firefighters is an unreasonable search because the potential risk of injury or loss of life is not sufficiently "catastrophic" to justify the infringement upon the privacy interests of the individual employees. It is not until after it has completed its balancing test that the majority expressly considers the government's status as an employer. Having already decided that the proposed mandatory testing is unconstitutional, the majority invokes the doctrine of "unconstitutional conditions" to support its conclusion that "a search otherwise unreasonable does not become constitutionally palatable because it is attached as a condition of employment." Lovvorn, at 1548 (citing National Federation of Federal Employees v. Weinberger, 818 F.2d 935, 943 (D.C.Cir.1987)).[26]
 
 
 102
 The flaw in this argument lies in the premise, i.e., that the search in this case is "otherwise unreasonable." I believe that the majority erred by failing to give greater weight to the City's concerns as an employer when performing the initial balancing test. The issue is not whether the City of Chattanooga can subject its employees to an unconstitutional search as a condition of employment; but rather, whether the City has legitimate reasons as an employer which would justify screening its work force for drug abusers. Although the case law is clear that a public employee cannot be made to surrender a constitutional right as a condition of employment, this proposition begs rather than answers the question. There is no right, constitutional or otherwise, to be impaired for duty or to engage in illegal drug usage. I do not find the incantation of the "unconstitutional condition of employment" principle found in many of drug testing cases to be helpful in resolving the issue of whether the fourth amendment is offended by the drug testing of public employees.
 
 
 103
 To hold that the fourth amendment does not prohibit mandatory drug testing of public employees does not diminish their constitutional rights vis-a-vis their private sector counterparts. Rather, it merely places governmental employers, such as the City of Chattanooga, on par with private companies.
 
 
 104
 In addition to the public safety, governmental liability, general job performance, public confidence, and other factors which weigh in favor of drug testing, I am also persuaded by the lack of an acceptable alternative for detecting drug use by public employees. Under an individualized suspicion requirement, urinalysis essentially becomes a tool of confirmation, rather than discovery. Therefore, an employer would be forced to resort to other more traditional methods of investigation such as interrogation and surveillance. Not only would such tactics be more intrusive, they would also presumably be subject to constitutional restraints. I do not believe that the fourth amendment requires a public employer to wait until one of its employees is involved in a major accident or incident before it can constitutionally administer a drug test.[27] In fact, a single incident of even major proportions would not constitute the type of "reasonable suspicion" which would enable department-wide testing. A mandatory department-wide testing program would diminish the stigma of being "singled out" for testing, and would eliminate the subjectivity which is inherent in any "reasonable individualized suspicion" test. Moreover, mandatory testing would have a salutory deterrent effect on potential users and would hopefully encourage drug abusers to seek treatment.
 
 
 105
 I reject the notion implicit in many of the cases that "if government can make its employees do this today, what will it make them do tomorrow?" The courts have consistently demonstrated their ability to deal with the "tomorrows." Further, this kind of "slippery slope"[28] argument is of equal force when inverted, i.e., "if government cannot do this today, what will we forbid it to do tommorrow? "
 
 
 106
 I suggest that the resolution of this controversy is best left to the political arena where the balancing of interests could be thrashed out in a real world setting. I am not unsympathetic to those employees who find the concept of drug testing unnecessarily accusatory and the procedures embarrassing. But, I think that these concerns must be viewed in the context of a nation caught in the throes of a drug problem that threatens its continued stability. I am reluctant to beat the "drug crisis" drum, for it inevitably suggests an ends justifies the means approach. Nevertheless, the fourth amendment balancing test requires a similar analysis, i.e., does the end (a drug-free public work force) justify the means (urinalysis, which necessitates an intrusion on the privacy interests of individual workers).
 
 
 107
 Given this analytical framework, I do not think that it is inappropriate to take judicial notice of the extent of the drug problem among the American workforce. It has been estimated that ten to twenty percent of American workers use dangerous drugs on the job[29] resulting in a total cost of approximately sixty billion dollars annually.[30] There is no reason to believe that public employees are immune from the problem of drug abuse which is prevalent throughout all segments of our society.[31] Moreover, I believe we should also consider some of the other ramifications of the current drug problem. Federal, state, and local governments (including the City of Chattanooga) are currently spending billions of dollars annually on the "war against drugs." The Achilles heel of this enforcement effort is that it deals almost exclusively with supply and does little with demand. The most effective way to deal with the drug problem is to dry up the demand. Certainly, if the government, as the nation's largest employer, demanded a drug-free work force, it would have a significant impact on the demand side of the ledger.
 
 
 108
 Although writing a dissent by definition puts one on the losing side of an issue, there are certain compensations. One advantage is that a greater degree of latitude is available. I have not tried to set forth the precise parameters of a drug testing program which will not implicate the fourth amendment, and I readily admit that the precise contours of any given program are very important. My purpose really is to be a counterpoint to the majority of decisions which flatly conclude that no mandatory department-wide drug testing program is constitutional absent individualized suspicion where public employees are involved. I also write to express concern that the conclusion that such programs are unconstitutional may become fixed through repetition just as surely as through further analysis. The literature contains an ever expanding number of cases which address the constitutionality of drug testing; many of these decisions, however, merely parrot the conclusion that drug testing constitutes a search within the meaning of the fourth amendment.
 
 
 109
 In sum, I do not believe drug testing of the type proposed here constitutes a search within the meaning of the fourth amendment. Assuming urinalysis does amount to a fourth amendment search, I do not believe that it is unreasonable.[32] I would reverse the judgment of the district court and remand for further proceedings.
 
 
 
 *
 The Honorable Edward H. Johnstone, Chief United States District Judge for the Western District of Kentucky, sitting by designation
 
 
 [1]
 The constitutional right that is being pressured here is not the right "to be impaired for duty or to engage in illegal drug usage" as the dissent appears to suggest but, rather, to be secure from unreasonable searches and seizures
 
 
 [1]
 This is intended to be my dissent in Lovvorn as well as in the companion case of Penny, et al. v. Kennedy, et al., 846 F.2d 1563 (6th Cir. 1988). Since at the time of writing I did not know which opinion would issue first, I have addressed both cases in this dissent
 
 
 [2]
 National Treasury Employees Union v. Von RAAB, 816 F.2d 170 (5th Cir.1987), cert. granted, --- U.S. ----, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988)
 
 
 [3]
 But cf. Brotherhood of Locomotive Engineers v. Burlington Northern RR, 838 F.2d 1087, 1092-93 (9th Cir.1988) (mandatory post-accident testing of railroad workers by private company violates collective bargaining agreement which implicitly incorporates fourth amendment guarantees to privacy)
 
 
 [4]
 For purposes of this discussion, I want to deal with the issue of the "observed donation" over which so much ink has been spilled in the opinions. I am confidently assuming that if we otherwise remove the legal hurdles to drug testing that the technology exists whereby the employee may donate the sample with relative privacy. Although I do not wish to make light of this concern, I suggest that the whole issue of the "observed donation" has been somewhat of a red herring in these cases. The courts have yet to articulate a constitutional right of "modesty."
 
 
 [5]
 Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)
 
 
 [6]
 In commenting on this language, the Supreme Court later said: "[T]he specific content and incidents of this right must be shaped by the context in which it is asserted." Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968)
 
 
 [7]
 The subsequent history of Wyman is also interesting in that it has never been overruled and, when referenced in subsequent Supreme Court decisions, the reference is not usually to the fourth amendment issues. However, those cases that have discussed Wyman in a fourth amendment context cast no doubt on its continuing validity. For example, the Court in South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), upheld the constitutionality of the police "inventory search" of impounded vehicles. Although the decision is primarily bottomed on the conclusion that "the conduct of the police was not 'unreasonable' under the Fourth Amendment," id. at 376, 96 S.Ct. at 3100, the Court also acknowledges that an inventory may not even be a search. The Court stated:
 Given the benign noncriminal context of the intrusion, see Wyman v. James, 400 U.S. 309, 317, [91 S.Ct. 381, 385, 27 L.Ed.2d 408] (1971), some courts have concluded that an inventory does not constitute a search for Fourth Amendment purposes. See, e.g., People v. Sullivan, supra, [29 N.Y.2d] at 77 [323 N.Y.S.2d 945], 272 N.E.2d, at 469; People v. Willis, 46 Mich.App. 436, 208 N.W.2d 204 (1973); State v. Wallen, 185 Neb. 44, 49-50, 173 N.W.2d 372, 376, cert. denied, 399 U.S. 912 [90 S.Ct. 2211, 26 L.ED.2d 568] (1970).
 Opperman, 428 U.S. at 370 n. 6, 96 S.Ct. at 3097 n. 6. Opperman is also interesting in that it acknowledges that administrative procedures well may be justified notwithstanding that the harm sought to be prevented by the procedure may seldom occur. Justice Powell, in his concurrence, observes:
 Except in rare cases, there is little danger associated with impounding unsearched automobiles. But the occasional danger that may exist cannot be discounted entirely. See Cooper v. California, 386 U.S. 58, 61-62 [87 S.Ct. 788, 790-91, 17 L.Ed.2d 730] (1967). The harmful consequences in those rare cases may be great, and there does not appear to be an effective way of identifying in advance those circumstances or classes of automobile impoundments which represent a greater risk.
 Opperman, 428 U.S. at 378, 96 S.Ct. at 3101 (Powell, J., concurring). The observation that the rare case that presents a danger is hard to identify in advance by other means is equally applicable to the use of mandatory department-wide drug testing to ferret out those who are unfit for duty.
 
 
 [8]
 In reality, the job does not "merely cease." Rather, government workers have a variety of means at their disposal through which they may challenge their dismissals. In general, public employees enjoy many more protections than any comparable class of private sector employees in this country. If drug testing becomes a condition of employment, it also becomes, where applicable, negotiable; it becomes subject to civil service or merit board review; judicial review is available; and, last but certainly not least, it can be made a subject of political pressure. Governmental leaders have to face the electorate and no elected official will lightly incur the wrath of employee groups
 
 
 [9]
 Just as I suggested earlier, that a kind of knee-jerk reaction to the normally private act of urination has distorted the "reasonable expectations of privacy" analysis, I also suggest that the fact that we are dealing with drugs has distorted the "repercussions" aspect of the analysis. Since most drug related activities can trigger criminal sanctions, the tendency is to explore this issue against the backdrop of the fourth amendment's application to criminal cases. Implicit in my analysis is that a drug testing program has the necessary safeguards built in so that criminal sanctions for drug usage will not follow. I fully recognize that a positive result on a drug test may place the spotlight on a given employee resulting in a closer scrutiny of that person. A scenario can be envisioned in which further evidence of drug use might lead to additional problems, one of which could be a criminal investigation. This does not suggest to me that a "fruit of the poisonous tree" analysis is implicated since my premise is that the tree is not poisoned
 
 
 [10]
 Other exceptions to the warrant requirement include: "hot pursuit," Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); "stop and frisk," Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); "border searches," United States v. Hernandez, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); "plain view," Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); "school searches," New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); "consent searches," United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); "administrative searches of highly regulated industries," Donovan v. Dewey, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981)
 
 
 [11]
 As I indicate infra, I think public employee drug testing can be justified even if the testing is found to be a search covered by the fourth amendment. Nonetheless, I do not want to detract from the argument that it is not a search by the mere making of another argument
 
 
 [12]
 The courts that have quite uniformly required the governmental unit to have a "reasonable suspicion" before drug testing will be allowed have arguably missed the point of the drug testing programs. I contend that the analogy should be to proficiency testing and not criminal investigations. When a city tests its employees periodically in any number of ways to see if they are fit to do what they are being paid to do, it is not out of any "reasonable suspicion" that they are not. Rather, it is the act of a prudent employer satisfying itself that its employees are up to standards and motivating them to stay that way
 
 
 [13]
 If an officer is truly addicted, he may have lost the ability to voluntarily remain drug free. However, that officer should turn himself in and take advantage of the City's rehabilitation (not dismissal) program for voluntarily admitted addiction. If a person knew he would get caught, he would have an incentive to turn himself in and then do a favor to himself, the City, and the public
 
 
 [14]
 Compare Shoemaker v. Handel, 795 F.2d 1136 (3d Cir.1986), where mandatory drug testing of jockeys by public authorities was approved
 
 
 [15]
 Justice O'Connor announced the judgment of the Court and delivered an opinion in which Chief Justice Rehnquist, Justice White and Justice Powell joined
 
 
 [16]
 It should also be noted that Justice O'Connor expressly refrained from addressing the issue of drug testing. 107 S.Ct. at 1504 n. ** ("Nor do we address the proper Fourth Amendment analysis for drug and alcohol testing of employees.")
 
 
 [17]
 See supra note 4
 
 
 [18]
 Numerous cases have cited public safety concerns in upholding mandatory drug testing of workers involved in hazardous activities or those who perform functions which involve the safety and welfare of large numbers of people. See, e.g., Jones v. McKenzie, 833 F.2d 335 (D.C.Cir.1987) (school bus attendant and other transportation department employees); Division 241, Amalgamated Transit Union v. Suscy, 538 F.2d 1264 (7th Cir.) (per curiam), cert. denied, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976) (bus drivers and other transportation workers); Transport Workers Union of Philadelphia, Local 234 v. Southeastern Pennsylvania Transportation Authority, 678 F.Supp. 543 (E.D.Pa.1988) (railroad workers); Rushton v. Neb. Pub. Power Dist., 653 F.Supp. 1510 (D.Neb.1987) (nuclear power plant workers); Allen v. City of Marietta, 601 F.Supp. 482 (N.D.Ga.1985) (electrical workers). But see Railway Labor Executives Ass'n. v. Burnley, 839 F.2d 575 (9th Cir.1988) (railroad workers could not be tested absent individualized suspicion of drug use)
 
 
 [19]
 Although the majority would allow testing if there was evidence of a "significant department-wide drug problem," it does not attempt to define exactly what type of evidence is required or where the threshhold lies. The evidence in Lovvorn indicated that 25 out of 400 or 1 out of every 16 firefighters tested positive for drug use in 1985. The majority does not argue that this evidence is "tainted"; rather, it simply concludes that the problem is not sufficiently "wide-spread" to justify testing in this case. Likewise, the majority apparently concluded that the fact that 2 of the 360 police officers tested positive in 1985 combined with unconfirmed rumors of drug use by "several" officers was insufficient to justify the testing of the officers in Penny
 
 
 [20]
 See, e.g., Railway Labor Executives' Ass'n v. Burnley, 839 F.2d 575 (9th Cir.1988) (federal regulations which mandated drug testing of employees of privately owned railroad violated fourth amendment where testing was performed absent individualized suspicion)
 
 
 [21]
 This unique responsibility also has an impact on the other side of the scale and I would contend that police officers have a diminished expectation of privacy. See, e.g., Mack v. FBI, 653 F.Supp. 70 (S.D.N.Y.1986) (FBI agent has a diminished expectation of privacy in his personal affairs, therefore it was not unreasonable to require him to submit to urinalysis in light of accusations that he had used cocaine)
 
 
 [22]
 In Penny, the majority concedes that a stronger case can be made for mandatory drug testing of law enforcement agents. At 1567-68. Nevertheless, the majority concludes that testing is still unreasonable absent individualized suspicion. This conclusion is based primarily on the assumption that "[m]ost of the harm imposed on society because of impaired police takes the form not of lives lost, but in arrests not made and laws not enforced. And these losses, though significant, are not irretrievable." At 1567. As in Lovvorn, the majority concentrates heavily on the potential for loss of life resulting from drug-related accidents. Although this is an important concern, I would also give more weight to the risk of corruption within the police department caused by officers who use drugs. See National Treasury Employees Union v. Von RAAB, 816 F.2d 170 (5th Cir.1987), cert. granted, --- U.S. ----, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988) (random testing of customs agents involved in drug enforcement not unreasonable even absent individualized suspicion). But cf. Policeman's Benevolent Ass'n of New Jersey v. Washington Township, 672 F.Supp. 779 (D.N.J.1987) (random and annual mandatory drug testing of police officers were unreasonable searches because they were not based on individualized suspicion); Capua v. City of Plainfield, 643 F.Supp. 1507 (D.N.J.1986) (mass testing of police officers and firefighters unreasonable absent individualized suspicion); Feliciano v. City of Cleveland, 661 F.Supp. 578 (N.D.Ohio 1987) (mandatory testing of police academy cadets unreasonable absent individualized suspicion)
 
 
 [23]
 Studies have shown that drug abusers function at only 50 to 67 percent of their performance capability. See M. Rothstein, Drug Testing in the Workplace: The Challenge to Employment Relations and Employment Law, 63 Chi.-Kent L.Rev. 683, 688 (1987) [hereinafter M. Rothstein.] Specifically, drug abusers demonstrated poor work quality, inability to complete assignments, impaired memory, lethargy, carelessness and mistakes. Id. (citing P. Bensinger, Drugs in the Workplace: Employers' Rights and Responsibilities, 1 (1984))
 
 
 [24]
 It has been estimated that employees who abuse drugs have an absenteeism rate 16 times higher than employees who do not use drugs. See Inwinkelreid, Some Preliminary Thoughts on the Wisdom of Governmental Prohibition or Regulation of Employee Urinalysis Testing, 11 Nova L.Rev. 563, 565 (1987)
 
 
 [25]
 In 1982, it was estimated that only 10 percent of the Fortune 500 corporations tested their employees or prospective employees for drugs. By 1987, however, over 50 percent of the 500 largest corporations performed drug testing. M. Rothstein, supra note 23, at 703
 
 
 [26]
 In Nat'l Fed'n of Fed. Employees v. Weinberger, federal civilian employees of the Department of Defense filed suit challenging the imposition of a drug testing program. The district court granted the government's motion to dismiss for lack of jurisdiction on the grounds that the employees were required to pursue their remedies through the Civil Service system before proceeding to federal court. The Court of Appeals for the District of Columbia Circuit reversed the dismissal but declined to decide the merits without further factual development in the trial court. 818 F.2d at 941-42. On remand, the court of appeals instructed the district court to apply the general fourth amendment balancing test to determine whether the testing was reasonable. But the court of appeals left open the question of whether individualized suspicion was necessary to justify the tests. In a single sentence in the penultimate paragraph of the opinion, the court of appeals stated: "We hold, too, that a search otherwise unreasonable cannot be redeemed by a public employer's exaction of 'consent' to the search is a condition of employment." 818 F.2d at 943
 It should be noted that, in a subsequent opinion, a different panel of the Court of Appeals for the District of Columbia Circuit held that mandatory drug testing of a school bus attendant and other transportation department employees was reasonable even absent individualized suspicion where testing was conducted as part of a routine medical examination and there was evidence of wide spread drug abuse among the workforce. Jones v. McKenzie, 833 F.2d 335 (D.C.Cir.1987).
 
 
 [27]
 I note that the Court of Appeals for the Ninth Circuit would not even allow for post-accident testing of railroad workers absent some other evidence that drug use was involved. Burnley, 839 F.2d 575, 587
 
 
 [28]
 Schauer, Slippery Slopes, 99 Harv.L.Rev. 361 (1985)
 
 
 [29]
 Time, Mar. 17, 1986 at 52-53 (cited in S. Wisotsky, The Ideology of Drug Testing, 11 Nova L.Rev. 763, 767 (1987))
 
 
 [30]
 Id. There is no question that the costs of alcohol abuse are even greater than those associated with drug abuse. Nevertheless, I agree with the majority that the City of Chattanooga is not constitutionally prohibited from dealing with the problems of substance abuse among its workers one step at a time
 
 
 [31]
 It has been estimated that 23 million Americans are currently using some type of illegal drug. M. Rothstein, supra note 23, at 684 n. 1 (citing Press Office, National Institute on Drug Abuse, Highlights of the 1987 National Household Survey on Drug Abuse, (Nov. 1986 rev.))
 
 
 [32]
 It is obvious that I have said little about the myriad number of drug testing cases which reach a result contrary to that suggested in this dissent. I offer two reasons for this. First, the facts of any drug testing case and the drug testing procedures adopted are indeed relevant and I do not mean to suggest to the contrary. Thus, in at least some of the cases which have struck down a drug testing program, I would have reached the same result even if not necessarily for the same reasons
 Second, if I were to start with the same initial premise as do most of the drug testing cases, I would reach the same result. It is not their scholarship I fault but, rather, the starting point of their analyses.
 I would also emphasize that my suggested resolution of the instant cases is to reverse and remand for further proceedings. It may well be that after the "reasonable suspicion" hurdle is removed, the program may have other deficiencies.