Roy PENNY; Charles Hass; Danny Gray; Lon Eilders; Larry Dempsey; and Bobby Tanner, individually and as the Executive Committee of Police Local 644 of the American Federation of State, County, and Municipal Employees, Plaintiffs–Appellees,

v.

Thomas KENNEDY, Commissioner of Fire and Police of the City of Chattanooga, Tennessee; and The City of Chattanooga, Tennessee, Defendants–Appellants.

No. 86–6280.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1988.

Decided May 23, 1988.

Charles Dupree, argued, Chattanooga, Tenn., for plaintiffs-appellees.

Michael A. McMahan, argued, Randall L. Nelson, Chattanooga, Tenn., for defendants-appellants.

Before MARTIN and GUY, Circuit Judges; and JOHNSTONE, Chief District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

The single issue presented in this appeal is whether the City of Chattanooga's mandatory urinalysis testing of its police officers, on a department-wide basis, without reasonable cause or suspicion to believe that the police officers tested used controlled substances, violates the plaintiffs' rights under the fourth amendment to the United States Constitution. Six Chattanooga police officers brought this action against the City and its Commissioner of Fire and Police, Tom Kennedy. The defendants appeal the district court's decision enjoining the urinalyses as violative of the fourth amendment. 648 F.Supp. 815. Although filed and heard separately, this case

* The Honorable Edward H. Johnstone, Chief United States District Judge for the Western District of Kentucky, sitting by designation.

is essentially a companion case to *Lovvorn, et al. v. The City of Chattanooga, et al.* (the "fire fighters" case), [ (846 F.2d 1539 (6th Cir.)], which held unconstitutional the City of Chattanooga's proposed mandatory urine testing of its fire department.

The facts in this case are very similar to those in the fire fighters case, and there is little, if any, dispute as to the facts relevant to our analysis here. Mandatory department-wide urine tests were first administered to all members of the Chattanooga Police Department beginning in early March 1985. The police officers, who were given four to six days' notice of the test, were tested when they took their "in service" training. Approximately fifty percent of the tests were observed by police department personnel. Police Chief Eugene McCutcheon changed his policy to require observation when one officer, who had tested positive, told him that it was possible for an officer being tested to switch a "clean" sample of the officer's urine. Chief McCutcheon had initiated the 1985 tests because of the arrest and conviction of two police officers on drug-related offenses in previous years. Also, on two or three other occasions, the department had acquired independent information that officers were using illegal drugs.

Of the 360 officers in the Chattanooga Police Department, only two tested positive for marijuana in the 1985 tests. According to the factual findings of the district court, a close monitoring of these individuals' personnel records and behavior patterns prior to the time the tests were administered would have provided the City with "reasonable suspicion" to require these two officers to submit to urine tests for drugs. Prior to the testing of these two officers in 1985, in fact, Chief McCutcheon and other police department personnel strongly suspected one of them of drug dealing and had been conducting surveillance of that officer.

In 1986, defendants initiated a new round of mandatory tests for the entire police department based on the following information: (1) a statement by one of the two officers who tested positive in 1985 that it was possible to switch urine samples; (2) "rumors" of switched urine samples in the 1985 tests; (3) a tip from the Federal Bureau of Investigation that an officer of the department had been in contact with a drug dealer; (4) a statement made to Chief McCutcheon by an officer who admitted using marijuana (and was terminated) that "several" police officers used marijuana; and (5) a statement made to Commissioner Kennedy by a police officer who had gone through a drug rehabilitation program that there had been some switched samples in the 1985 drug tests.

Despite this information, Chief McCutcheon stated before the trial of this case that the Chattanooga Police Department had no drug problem. By the conclusion of the trial, he still acknowledged that there was no drug problem in "ninety percent" of the department. No objective evidence of a drug problem was presented to the district court.

■ For the reasons stated by this court in our opinion in *Lovvorn*, we hold that the compulsory urinalysis of police officers constitutes a "search and seizure" within the meaning of the fourth amendment. In doing so, we join other circuits in holding that mandatory urinalyses of public sector employees constitutes a "search." *See National Fed'n of Fed. Employees v. Weinberger*, 818 F.2d 935 (D.C.Cir.1987); *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 176 (5th Cir.1987), *cert. granted*, — U.S. —, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir.1987); *Division 241 Amalgamated Transit Union v. Suscy*, 538 F.2d 1264, 1266–67 (7th Cir.), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976); *cf. Shoemaker v. Handel*, 795 F.2d 1136, 1142 (3d Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986).

■ Having said that mandatory urinalysis constitutes a search, we turn now to the critical question of whether such a search of police officers is unreasonable. Qualification as a "search" only ... begin[s] the inquiry into the standards governing such searches," for the fourth amendment pro-

scribes only "unreasonable searches and seizures." *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985). To determine whether the mandatory urinalysis of police officers is "reasonable," we shall employ the same analysis we used in *Lovvorn*. Thus, we seek to balance the constitutional liberties of the police officers and the legitimate interests of the government in "the efficient and proper operation of the work place." *O'Connor v. Ortega*, 480 U.S. ——, ——, 107 S.Ct. 1492, 1501, 94 L.Ed.2d 714, 727 (1987).

Like fire fighters, the police officers reasonably expect that they will not be compelled to donate urine samples. They also reasonably expect that their urine will not be exposed to sophisticated chemical analyses that will provide the tester with an abundance of personal information about the officer.

On the other hand, we recognize that the City of Chattanooga possesses compelling reasons for determining whether any of its officers are using illegal drugs. We agree with the district court that it is obvious that the public does not want a police force that is charged with enforcing the laws to be using drugs in violation of the law. Moreover, police officers, like fire fighters, are often involved in emergency situations where it is critical that their perception, decision-making abilities, short-term memory, motor skills, and judgment not be impaired for any reason.

As we noted in our opinion in *Lovvorn*, the Supreme Court has explained that, when conducting a balancing test of the government's and the individual's interests, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Thus, we turn now to a determination of whether the City of Chattanooga was justified in initiating its mandatory drug testing of police officers. *See also T.L.O.*, 469 U.S. at 341–42, 105 S.Ct. at 742 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20

L.Ed.2d 889 (1968)). The district court determined that, absent reasonable individualized suspicion, the City lacked the necessary justification to institute the urinalyses. The City argues on appeal, however, that, because of the significance of the government's interests, we should not require a reasonable suspicion of drug use before sanctioning such searches.

For the reasons stated by this court in *Lovvorn*, we are not persuaded to follow the cases cited by the City of Chattanooga for the proposition that mandatory drug tests are constitutional absent individualized suspicion. Specifically, we reject the argument that mandatory drug testing can be analogized to administrative searches or hinge on the amount of regulation in the work place. We believe that when determining whether a search is "reasonable," attention must be focused on the nature of the work force to be searched and the potential losses that may be imposed on society by not allowing mandatory drug tests in that work force. The higher the costs and more irretrievable the losses, the stronger the argument for finding reasonable the initiation of a drug testing program. Furthermore, if the harm to society is likely to be very high, society is less likely to consider reasonable the employee's subjective expectations of privacy. Finally, we believe there must also be a determination of the extent to which mandatory drug testing would decrease the risk of such losses being imposed on society.

We believe the harm to society of a police officer being impaired may be significant. Still, we do not believe the likelihood of enormous losses being imposed on society because of impaired police officers to be equivalent to that which may be imposed by impaired air traffic controllers or nuclear plant employees, employment sectors where employees literally hold thousands of lives in their hands everyday. *See National Ass'n of Air Traffic Specialists v. Dole*, No. A87–073 unpublished slip op. (D.C.Alaska, 3/27/87). While we can certainly imagine situations where an impaired police officer could jeopardize many

lives, that does not describe the routine activities of a police officer. Most of the harm imposed on society because of impaired police officers takes the form not of lives lost, but in arrests not made and laws not enforced. And these losses, though significant, are not irretrievable.

■ This difference in the potential harm to society of an impaired air traffic controller and an impaired police officer becomes even more significant when a determination is made of the extent to which drug tests will decrease the risk of such losses being imposed on society. In the case of the City of Chattanooga Police Department, there was no evidence of a widespread or significant drug problem. Thus, the potential gain to society of initiating mandatory drug testing was significantly lower than would have been the case if there had been evidence of a systemic drug problem. We believe the probability of detecting an impaired employee must be considered as well as the benefit to society of removing such an employee. As the Supreme Court said in *New Jersey v. T.L.O.*, "reasonable grounds must [exist] for suspecting that the search will turn up evidence" of work-related drug use. 469 U.S. at 342, 105 S.Ct. at 743.

■ . We believe there exists a continuum of employment categories that is defined both by the degree of suspicion that a drug problem exists and by the potential harm to society of an impaired employee operating in that employment sector. For a mandatory drug search to be "reasonable," the potential harm to society of an impaired employee must be very large or the level of suspicion that a drug problem exists substantial. The lower the potential harm to society, the more suspicion needed. Of course, the suspicion must be grounded in objective evidence and based on reasonable inferences therefrom.

■ In the overwhelming number of jobs where an impaired employee is not in a position to impose significant, irretrievable losses on society, a mandatory drug test is not reasonable absent individualized reasonable suspicion. While we believe there may be situations where police officers are

in a position to impose significant losses on society because of a drug impairment, it is clearly not of the same magnitude as exists with air traffic controllers, for example. Furthermore, the harm to society of an impaired police officer will often not be an irretrievable one. We strongly support the City of Chattanooga's concerns that police officers impaired by the use of illegal drugs will result in convictions not realized and arrests not made. Drug use by police officers unquestionably increases significantly the risks of corruption and conflicts of interest. We believe, however, that the City's concerns may not be remedied by unconstitutional means. Accordingly, for a mandatory drug test of police officers to be reasonable, there must be some evidence of a significant, department-wide drug problem or there must be individualized suspicion. No evidence of such a problem exists here. The low probability of a given test being positive, combined with the frequently retrievable nature of the costs likely to be imposed on society by an impaired police officer, do not justify a restriction of police officers' constitutional rights. Not only are the losses to society of an impaired police officer lower than was the case in *National Ass'n of Air Traffic Specialists* or *Rushton v. Neb. Pub. Power Dist.*, 844 F.2d 562 (8th Cir.1988) (upholding the mandatory drug testing of certain nuclear plant employees because of the size of society's interests), but there is no evidence here of drug use.

We do note that, unlike the mandatory drug testing of fire fighters, a mandatory drug test of police officers may well measure impairment. A much stronger argument can be made, then, that the fact that a police officer tested positive indicates job impairment. Police officers are not only subject to call twenty-four hours a day, but, if they see a serious violation of the law, they are expected to perform their duties even when off duty. Thus, the officer who obtains drugs from a drug dealer or friend has a duty to make an arrest. Failure to do so constitutes a breach of that duty. It is also likely that officers who use illegal drugs rarely turn them-

selves in for violating the drug laws they are charged with enforcing. Drug tests of police officers, therefore, at least of those officers bound by duty to arrest those distributing or using illegal drugs, do in fact measure impairment. This fact reduces somewhat the City's burden of justifying the initiation of drug tests. It also reduces somewhat the reasonableness of the police officers' expectations of privacy.

■ Because we do not believe there was *any* objective evidence indicating a drug problem in the Chattanooga police department in 1986, however, we conclude there was not a significant justification for initiating the mandatory drug tests at issue here. A mandatory drug test that accurately measures impairment, though certainly less unreasonable than one that does not measure impairment is, nevertheless, constitutionally unreasonable if it intrudes upon reasonable expectations of privacy absent individualized suspicion or evidence of a department-wide drug problem. This is particularly true where the loss to society of an impaired employee is generally not catastrophic or irretrievable. Accordingly, we need not determine "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 742 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879).

■ Finally, we emphasize that a search otherwise unreasonable does not become constitutionally palatable because it is attached as a condition of employment. *National Fed'n of Fed. Employees v. Weinberger*, 818 F.2d at 943. Absent compelling reasons, the government should not be allowed to accomplish indirectly what it cannot accomplish directly under the Constitution. That is the central tenet of the doctrine of unconstitutional conditions. *See Fraternal Order of Police v. Philadelphia Police Department*, 812 F.2d 105, 111–12 (3d Cir.1987); *Blackburn v. Snow*, 771 F.2d 556, 568 (1st Cir.1985); *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The issue presented in this case is a difficult one, for it explores the line between two critical societal concerns. On the one hand is the compelling need to eliminate the scourge of illegal drugs that undermines the effectiveness of and the public's confidence in those public servants charged with the duty and responsibility of enforcing the law. On the other hand is the compelling right of all citizens under the U.S. Constitution to be free from unreasonable searches and seizures. We believe those charged with enforcing the law are also protected by the law. While we strongly support the City of Chattanooga's concerns of drug-related impairment in its police department, we believe that our holding today affirms the fundamental principle that all citizens, including those employed in the public sector, enjoy constitutional protection. The guarantees of protection afforded by the Constitution are most vital where the temptations to abandon them in favor of attractive policy goals are most seductive.

Accordingly, the decision of the district court enjoining the City of Chattanooga from initiating mandatory drug testing of police officers as violative of the police officers' fourth amendment rights is affirmed.

JOHNSTONE, Chief District Judge, concurring.

I concur with the holding in Judge Martin's opinion in this case to the same degree and for the same reasons that I concurred in *Lovvorn v. City of Chattanooga*, 846 F.2d 1539 (6th Cir.).

As in *Lovvorn*, I do not consider the "potential," "significant" or "irretrievable harm" which *might* be visited upon society by drug-using public employees to be proper justification for a search, nor do I find it necessary to add this new and indeterminate factor into our fourth amendment analysis of this case. I base my decision herein on the fact that there was no objective evidence in this case of a systemic drug problem in the police department or that any individual policeman to be tested in 1987 might have a drug problem. Con-

sequently there are no specific, articulable, objective facts which would justify the imposition of warrantless, mandatory urinalysis of the policemen in this case.

RALPH B. GUY, Jr., Circuit Judge, dissenting.

For the reasons set forth in *Lovvorn v. City of Chattanooga,* 846 F.2d 1359 (6th Cir.1988), I must respectfully dissent.