**Frank WEICKS, et al.**

v.

**NEW ORLEANS POLICE DEPARTMENT, et al.**

**No. 88–3080.**

United States District Court, E.D. Louisiana.

Aug. 1, 1988.

Frank G. DeSalvo, Joseph P. Raspanti, New Orleans, La., for plaintiff.

George V. Perez, Jr., Deputy City Atty., New Orleans, La., for defendant.

## MEMORANDUM AND ORDER

SEAR, District Judge.

On July 19, 1988, plaintiffs Frank Weicks, Keith Turner, Rannie Mushatt, Jeff Sislo, Louis Lejarza, and Lloyd Clark, each of whom is a member of the New Orleans Police Department, filed a verified complaint on behalf of themselves and all others similarly situated against the New Orleans Police Department, the City of New Orleans, and Warren G. Woodfork, Sr., the Superintendent of the New Orleans Police Department. In their complaint, the plaintiffs seek to have the court permanently enjoin the drug screening urinalysis program of the New Orleans Police Department ("NOPD") established by Superintendent Woodfork on July 13, 1988. Pursuant to a telephone conference held on July 19, 1988 and an order issued July 20, 1988, the parties have filed memoranda of law and a joint stipulation of facts, submitting the matter to the court for trial on the merits without hearing.

## I. BACKGROUND

The drug screening urinalysis program of the NOPD covers the members of the Major Staff, the Special Investigations Division, the Internal Affairs Division, the Special Integrity Unit, and the Public Affairs Division; the program includes all present members of these units, those seeking to be transferred into one of these units, and officers temporarily assigned to the Special Investigations Division.

The Major Staff consists of the Superintendent, the three deputy-Superintendents, the Superintendent's executive and administrative assistants, and the heads of the departments of Research and Planning, Internal Affairs, and Public Affairs.

The Special Investigations Division ("S.I.D.") comprises four sections: intelligence, narcotics, vice, and an administrative section. The Intelligence Section is primarily responsible for collection and processing of information about organized crime; gathering, evaluating, and recording information concerning all public disorders in the city; and providing security for VIP visits to the city. The Narcotics Section is responsible for all investigations of narcotics violations. The Vice Crimes Section investigates complaints of commercialized vice violations, including gambling, pornography, prostitution, and those related to alcoholic beverage outlets. The Administrative Section of the S.I.D. provides management, direction, and supervision for the other three sections.

The Internal Affairs Division conducts investigations of alleged misconduct by members of the NOPD, whether commissioned or non-commissioned, including misconduct such as theft, corruption, and vice. The Special Integrity Unit investigates complaints of criminal misconduct by a police officer.

The Public Affairs Division is responsible for maintaining daily liaison between the NOPD and the news media; it is charged with disseminating information on police matters to the public via the news media,

and with assisting other members of the NOPD in accomplishing the same. The Communications Center notifies the Director of the Public Affairs Division of all major incidents, and Public Affairs provides coverage at the scene and obtains the necessary information for public dissemination.

In instituting the drug-testing policy, Superintendent Woodfork expressed concern for "the impact that pervasive drug use has had on crime in New Orleans," and noted that "[m]ore crime is drug related and more police resources are being dedicated to narcotics enforcement than ever before." Superintendent Woodfork emphasized that "[b]ecause of the sensitive nature of these investigations, it is crucial for the integrity of police operations to be maintained." He added that the drug-testing program was being implemented to protect "not only the chain of evidence, but also the officers' personal reputations as well."[1]

Under the drug-testing program, any member of one of the covered units who for personal reasons chooses not to participate will be reassigned to other duties. No punitive action will be taken, and every attempt will be made to assign the officer to a unit of his choosing. In the future, all officers wishing to transfer to the S.I.D. or to work in the S.I.D. on a detail basis will be considered only if they submit to the drug screening analysis. Everyone in S.I.D. will be tested within a specified period of time; the order in which they are tested will be determined randomly.

Officers to be tested shall be given 48 hours advance notice of the date, time, and place of the urinalysis. Testing will be done by independent, privately operated labs which shall have sole responsibility for both collection and testing of the urine sample and for maintaining the chain of evidence. The officers to be tested shall be identified to the labs strictly by a number assigned to them by their commanding officers. Only the officer to be tested and his

---

**1.** *See* Department of Police Interoffice Correspondence, dated July 13, 1988, from Warren G. Woodfork, Sr., Superintendent of Police, to all members of S.I.D., regarding "policy for urinalysis," attached as Appendix A.

commanding officer shall know the correlation between the officer and his assigned number, unless and until a positive result is obtained.

At the test site, an observer gives the officer a form on which he may list any medication he has taken or any other legitimate reason for his having been exposed to potentially illicit drugs in the preceding thirty days. The form is sealed in an envelope that will not be opened unless the urine test is positive. This envelope shall identify the officer only by his confidential identification number, shall be maintained by the lab, and shall be destroyed in the event of a negative result.

After the employee surrenders his outer garments and personal belongings, the observer gives the employee a bottle for the specimen. The employee then enters a restroom stall and produces the urine sample. In order to prevent tampering, the observer remains in the restroom to listen for the normal sound of urination and to collect the sample immediately after urination, but the observer does not visually observe the act of urination. The employee then leaves the stall and presents the bottle containing the specimen to the observer. To ensure that a previously collected sample has not been proffered, the observer is instructed to reject an unusually hot or cold sample.

In the event that the results register positive,[2] the primary lab will verify the results through a confirmation test and if the positive reading is confirmed, the primary lab will transport the sample to the secondary lab for yet another test. The Superintendent will be notified only of the identification numbers whose corresponding samples show three positive readings. The Superintendent shall then contact the commanding officer who assigned the numbers to obtain the identity of the officer.

Any officer who receives three positive readings shall be subject to administrative disciplinary action. However, the officer shall first be given the opportunity to have the sample tested by a lab of his choosing from a list of six accredited facilities. Nothing discovered in the course of these tests will be used in any criminal proceedings.

## II.  DISCUSSION

The Fourth Amendment to the United States Constitution ensures "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." Because drug screening by urinalysis meaningfully interferes with the reasonable expectation of privacy of those who are subjected to it, compulsory urine testing by the government constitutes a search for purposes of the Fourth Amendment. *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175–76 (5th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *see Penny v. Kennedy*, 846 F.2d 1563, 1565 (6th Cir.1988). The determination of whether the search is unreasonable, and therefore in violation of the Fourth Amendment, depends upon an assessment of the balance of "the social and governmental need for [the search] against the risk that the search will itself undermine the social order by unduly invading personal rights or privacy." *Von Raab*, 816 F.2d at 176.

The NOPD has not suggested in any manner that it suspects there is a significant amount of drug use among the members of the NOPD who are to be tested. Indeed, one of the stated purposes of the program is to protect the personal reputations of the officers. Although some degree of individualized suspicion is usually required in order for a search to be considered reasonable, in certain limited situations, the balance of interests obviates the need for such a requirement. *Id.* at 176–77; *see also Lovvorn v. City of Chattanooga, Tenn.*, 846 F.2d 1539, 1556–57 (6th Cir. 1988) (Guy, J., dissenting with respect to *Lovvorn* and *Penny*); *cf. Policeman's Benevolent Association of New Jersey, Lo-*

---

2. The urine samples will be tested for marijuana, cocaine, opiates, amphetamines, and phencyclidine (PCP).

cal 318 v. Township of Washington, 850 F.2d 133 (3rd Cir.1988) (LEXIS, Genfed library, Usapp file); contra, Penny, 846 F.2d at 1566. The Fifth Circuit, guided by the Supreme Court, recently identified a number of factors that are relevant in determining whether a drug-testing program is reasonable in the absence of any individualized suspicion.[3]

A. *Scope and Manner*

Like the drug testing program considered in *Von Raab*, the NOPD program minimizes the intrusiveness of the search. The tester does not directly observe the production of the urine sample, and the test is scheduled in advance, rather than by surprise. Similarly, the urinalysis results are either positive or negative, leaving no room for official discretion in interpreting the tests.[4]

Unlike the program in *Von Raab*, however, here the program is not limited to employees seeking *transfer* to sensitive positions, in which testing occurs only as a result of a process that the subject chooses to set in motion. Rather, the NOPD program not only includes those seeking transfer to certain units, but also extends to all those currently holding such positions, as well as those who are temporarily assigned to the S.I.D. subclass of these positions.

■ The plaintiffs argue that by applying the drug-testing program only to current members of certain listed units, the defendants "singled out" certain members of the NOPD for testing, and exercised precisely that unbridled discretion that is

not allowed when searches are permitted in the absence of individualized suspicion. See Von Raab, 816 F.2d at 177. That a drug-testing program need not be applied either on a department-wide basis or not at all, however, is demonstrated by *Von Raab* itself, where the Customs Service program covered only those seeking transfers to certain types of positions. Thus the mere fact that certain units have been selected for testing but not others does not automatically invalidate a program as an exercise of unbridled discretion.

The plaintiffs contend, however, that although the listed units were supposedly chosen because they are involved in more sensitive day-to-day interactions with drug-related affairs, in fact, the selected units have little or nothing to do with drug enforcement, while officers in the districts, who are not covered by the program, are out making arrests daily of drug-traffickers and are actually more involved with drug-related affairs. The defendants claim, on the other hand, that Superintendent Woodfork has identified those units of the NOPD that are most sensitive for drug enforcement purposes.[5]

I need not determine whether the units selected by Superintendent Woodfork for coverage under the program are actually those most sensitive to drug-related affairs in the NOPD, or even whether they are more sensitive than other units not selected. The Fourth Amendment does not require that a search program be perfect, or even the best that could be conceivably

---

**3.** Judge Hill, dissenting in *Von Raab*, suggests that an explanation should be given why a warrant and probable cause, or at least some level of suspicion, is not required in the particular case. *Von Raab*, 816 F.2d at 183, n. 1. Judge Hill further seems to suggest that the appropriate standard for dispensing with these requirements is the presence of "a special law enforcement need for greater flexibility." *See id.*, quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S.Ct. 733, 748, 83 L.Ed.2d 720, 741 (1985) (Blackmun, J., concurring).

I have understood the majority opinion in *Von Raab* as holding that these requirements are unnecessary whenever the constellation of factors is similar to *Von Raab*. In any event, I note that this case does present "a special law

enforcement need for greater flexibility," especially considering the nature and importance of the particular justifications.

**4.** The procedure used at the test site is virtually identical to the procedure used by the United States Customs Service and reviewed in *Von Raab*, 816 F.2d at 173–74. The procedure here contains added precautions, however, that protect the subject of the test from even having false positives become known the NOPD.

**5.** The defendants also note that they do not seek to exercise any discretion concerning which individuals in the units selected are to be tested vel non, and I do not understand the plaintiffs to suggest otherwise.

implemented,[6] but only that it be reasonable.[7]

### B. *Justification*

That drug use exacerbates the prevalence of crime in major American cities is well known. That the police department of these cities comprise the front line in the battle against drug-related crime is equally beyond dispute. The NOPD has instituted the urinalysis drug screening program in order to protect "the integrity of policy operations," the "chain of evidence," and the personal reputations of the officers as well.

In *Von Raab*, the Fifth Circuit discussed the manner in which the use of controlled substances by employees of the Customs Service may seriously frustrate that agency's efforts to enforce the drug laws. The reasons there with respect to the integrity of the Customs Service's operations are equally applicable to the police operations here:

> An employee's use of the substances he has been hired to interdict casts substantial doubt upon his ability to carry out his duties honestly and vigorously, and undermines public confidence in the integrity of the Service. The drug user's questionable integrity, as well as the high financial cost of obtaining illegal drugs, may increase his susceptibility to bribery by criminal drug enterprises seeking classified information.... Drug suppliers may also subject a drug-using employee to blackmail.

*Von Raab*, 816 F.2d at 178; *see Policeman's Benevolent Association of New Jersey*, 850 F.2d 133 (3rd Cir.1988) (LEXIS, Genfed library, Usapp file) (emphasizing "the need in a democratic society for public confidence and respect and approbation of the public officials on whom the state confers [the power to use lawful force to arrest and detain residents of the state]"); *Penny*, 846 F.2d at 1566 ("[I]t is obvious that the public does not want a police force that is charged with enforcing the laws to be using drugs in violation of the law."); *id.* at 1567 ("Drug use by police officers unquestionably increases significantly the risks of corruption and conflicts of interest."); *see also Lovvorn*, 846 F.2d at 1559 (Guy, J., dissenting).

The need of the NOPD to protect the "chain of evidence" arises from the fact that employees of the NOPD who are in sensitive drug enforcement positions are often exposed to large sums of cash and great quantities of controlled substances that have been seized and which constitute important evidence to be used to convict those from whom the items were seized. "The illicit drug user may be tempted to divert for his own use portions of drug shipments that are seized," *Von Raab*, 816 F.2d at 178, and given his "questionable integrity," he may be tempted to divert to his own use portions of the money seized as well. Either of these acts impairs the ability of the NOPD to pursue a primary objective of any police department: the prosecution of crime. *Cf. Penny*, 846 F.2d

---

**6.** Thus the Fifth Circuit did not strike down the Customs Service program simply because it may have been more effective to expand its scope to those already holding the sensitive positions. *Von Raab*, 816 F.2d at 181. Similarly, the Fifth Circuit noted that "a particular search may be reasonable even if its purpose might be accomplished by less intrusive methods." *Id.* at 180.

**7.** Under an equal protection analysis, indeed, those challenging the legislative judgment would have to convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker. *See Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (upholding mandatory retirement at age 60 for federal Foreign Service personnel); *see also New York City Transit Au-*

*thority v. Beazer*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) (upholding the exclusion of all methadone users from any Transit Authority employment). "Legislatures may implement their program step by step [in areas not involving fundamental rights or suspect classes], adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (cites omitted); *see also Lovvorn*, 846 F.2d at 1544 (rejecting an objection that the city should also have tested for the more serious problem of alcohol abuse: "A government decision to treat half of a problem rather than the entire problem may not be wise policy, but it is not an unconstitutional policy.").

at 1563 (voicing concern that police officers impaired by the use of illegal drugs will result in convictions not realized).

■ That the NOPD seeks to protect the personal reputations of its officers promotes the NOPD's legitimate and substantial interest in the protection of its own reputation and the maintenance of public confidence in the NOPD. Police officers are substantially aided in their duties by public trust and cooperation, and the public commonly views each individual officer as a representative of the department as a whole; the disgrace of even one officer would reflect negatively on the reputation of the police department as a whole.[8]

A public agency, the NOPD has a "strong interest in ensuring that its employees operate effectively." *Von Raab*, 816 F.2d at 178. Although the reasons for the search seemingly would apply to the department as a whole, the Superintendent has limited the scope of the program to certain units of the NOPD with regard to which the reasons carry a particular force. Consequently, in weighing the justification of the NOPD program, I must focus on the strength of the reasons in relation to the units covered by the program.

No member of the Major Staff is a party to this suit;[9] consequently, I do not address the constitutionality of the NOPD program as it applies to members of the Major Staff.

■ The application of the program to the Narcotics Section of the Special Investigations Division most directly realizes the fulfillment of the justifications underlying the drug-testing program, and can hardly be questioned. Although the Intelligence and Vice Crimes Sections of the S.I.D. do not expressly concentrate on violations of the narcotics laws, the activities with which these two sections are primarily concerned nevertheless involve significant and substantial contact with drug-related crimes. Organized crime, the primary responsibility

of the Intelligence Section, notoriously engages in and promotes violations of the drug laws. Similarly, crimes of vice—prostitution, pornography, gambling, and the like—are frequently encountered in tandem with the further vice of illegal drug use. Finally, the Administrative Section of the S.I.D., charged with management, direction, and supervision of the other three sections, likewise deals with drug-related crimes on a frequent basis. That its members may not personally effect arrests in the field does not eliminate the concerns that their integrity may be compromised, that they may be likely targets of bribes or blackmail, that they may divert important evidence to their own use, or that their personal reputations may be impugned in a manner that reflects deleteriously on the public image—and there the morale and effectiveness—of the police department as a whole.

The Special Integrity Unit and the Internal Affairs Division are charged with the investigation of alleged misconduct, criminal and non-criminal, respectively, by members of the police department. Although there is no reason to believe that such investigations will involve controlled substances any more than the investigations made by any other police officer with respect to the public at large, internal police department investigations do implicate the concern for the integrity of the police department with a special weight. The guardians of the guardians must be beyond reproach, in fact as well as appearance. Not to test the very officers who are responsible for investigating those officers whose tests return positive would cast grave doubt on the effectiveness of the entire program, both in fact and in the public eye, and undoubtedly be highly destructive of police morale as well.

■ Finally, the inclusion of the Public Affairs Division in the scope of the drug-testing program might seem unusual at

---

8. To the extent, however, that the NOPD seeks to protect the personal reputations of the officers purely for their own sake, such interest, albeit laudable, would not support the reasonableness of a search.

9. Indeed, all of the members of the Major Staff have already agreed to take part in the drug testing program.

first glance. However, the members of this division necessarily often receive advance information of a planned police action, such as a major drug bust, in order to provide coverage at the scene. Privy to important confidential information on a routine basis, it is essential that the integrity of the members of the Public Affairs Division not be compromised. Furthermore, it is worth noting that the disgrace of an officer in this division would be peculiarly embarrassing and damaging to the public image of the police department.

Plaintiff has argued that the connecting rationale of the units selected for coverage under the drug-testing program is not the sensitivity of the positions but the "elite" nature of the positions and the special "prestige" that they carry. Yet it would not be unreasonable for the NOPD to have concluded that the need to preserve the integrity of a unit is heightened in the case of those units perceived to be elite or prestigious. Any doubts harbored by the public about the integrity or the personal reputations of the "best" of the police department would be especially damaging to public confidence and police morale.

### C. *Place*

As in *Von Raab*, the search is conducted in a restroom, "the most private facility practicable." *Id.* at 178.

### D. *Voluntariness*

The NOPD program applies not only to those seeking to be transferred into or assigned temporarily to the listed units, but also to those currently in the listed units. On the other hand, any member who for whatever personal reasons chooses not to participate will be reassigned to other duties, and no punitive action will be taken; indeed, every attempt will be made to assign the officer to a unit of his choosing. Plaintiffs argue, however, that any reassignment will necessarily impose adverse effects upon an officer not wishing to be tested: the officer is not only transferred immediately from a prestige position to one that is generally known to be less coveted,

but is also subject to the embarrassment that goes along with the transfer to a less desirable position.

■ With regard to those who seek transfer or temporary reassignment to a covered unit, the adverse consequences of a disinclination to participate in the drug-testing program are relatively light, since all that is lost is the opportunity. *See id.* at 178. The adverse consequences that follow a refusal to participate in the program by one already a member of one of the listed units, however, are more serious. An officer may have become accustomed to a particular job, and dislike leaving it; and there may be those who would misinterpret an individual's decision not to suffer the violation of privacy entailed by a drug test. Yet police officers have no vested interest in a particular job position, and officers are subject to transfer among positions of the same rank at the discretion of the department.[10]

### E. *Employment Relationship*

"Government employees may be subject to searches or other restraints on their liberties that would be impermissible in the absence of the employment relationship so long as these requirements are reasonably aimed at assuring integrity and competence." *Von Raab*, 816 F.2d at 178; *see generally Lovvorn*, 846 F.2d at 1557–61 (Guy, J., dissenting) (emphasizing the importance of this factor). Any search must be "reasonably incident to the primary business of [an] agency," *Von Raab*, 816 F.2d at 178, and a "reasonable condition of employment," *id.* at 179. Each of these requirements is met in this case.

### F. *Administrative Nature of the Search*

As in *Von Raab*, the search program has been adopted solely for an administrative purpose; it is neither designed to enforce criminal laws nor likely to be used to bring criminal charges against the persons investigated. Although the search is not therefore per se reasonable, the need for protection against governmental intrusion dimin-

---

**10.** This discretion is now limited, of course, in the case where an officer who is intended to be transferred from a noncovered unit to a covered unit declines for personal reasons to subject himself to the drug screening urinalysis program.

ishes under these circumstances, *id.* at 179.[11]

### G. *Analogy to Regulated Industry*

Although this case does not involve a highly regulated private industry, all police officers, including those who are members of the units covered by the drug-testing program, "know that inquiry may be made concerning their off-the-job use of drugs and that the tolerance usually extended for private activities does not extend to them if investigation discloses their use of drugs." *See id.* at 180; *see Policeman's Benevolent Association of New Jersey,* 850 F.2d 133 (3rd Cir.1988) (LEXIS, Genfed library, Usapp file) ("[T]he police industry is probably the most highly regulated, with respect to performance of its employees, of any industry in New Jersey.").[12]

### H. *Availability of Less Intrusive Measures*

The availability of alternative sources of information or evidence must be considered in determining the reasonableness of a particular search. *Von Raab,* 816 F.2d at 180. Although background checks, surveillance, and interrogation are possible, they are not as effective as drug-testing, and are intrusive invasions of an individual's privacy in their own right. *See id.; Lovvorn,* 846 F.2d at 1561 (Guy, J., dissenting). Regarding those who seek transfer or temporary assignment to one of the covered units, observation of the performance of these officers while they were working in noncovered units provides "scant basis on which to evaluate their integrity and reliability should they be assigned to work in sensitive positions." *Von Raab,* 816 F.2d at 180.

Those already members of the covered units stand on a different footing, since the NOPD will have had opportunity to observe their behavior in the relevant job. On the other hand, integrity, unlike reliability, is not an easy characteristic to observe, since those who lack it may often succeed for a time in hiding the fact. That the NOPD program emphasizes the protection of the integrity of police operations can be seen both in the stated purpose and in the nature of the units selected for coverage. Thus the resort to drug testing of those who already are subject to observation in the relevant positions, although less urgently needed than in the case of those who have not served in a covered unit, remains closely tied to the primary justification for the search and operates directly to render the program more effective.

### I. *Effectiveness*

The NOPD program is likely to be considerably more effective than the search program upheld in *Von Raab.* By providing two days advance notice of testing rather than five, the NOPD program avoids the problem encountered in *Von Raab* in which the employee could probably avoid detection, and thus defeat the purpose of the test, merely by abstaining from drug use between the time of notification and the actual test. *See id.* at 180. Additionally, because the NOPD program covers those officers who currently occupy the listed units, it more effectively and more quickly ensures that the covered units are staffed with officers who are drug free than a program that only applies to those entering the listed units. *See id.*

In the end, the determination of whether a search is reasonable under the Fourth Amendment depends on "the totality of the circumstances in the particular case, weighing all of the factors suggesting constitutional violation against all of those indicating validity. *Id.* at 177. Here the difficulty of evaluating the balance is eased by the substantial comparability between the NOPD drug screening urinalysis program and the Customs Service program upheld in *Von Raab.*

The two programs differ in various respects, the most salient distinction being the inclusion of the current members of the covered units in the NOPD program. This

---

**11.** As in *Von Raab,* the NOPD has a need to test the members of the covered units in order to assure the integrity of the NOPD.

**12.** "Police officers are not only subject to call twenty-four hours a day, but, if they see a serious violation of the law, they are expected to perform their duties even when off duty." *Penny,* 846 F.2d at 1567.

distinction makes the NOPD program simultaneously less voluntary, but more effective, than the Customs Service program. The Fifth Circuit in *Von Raab* found that the lesser effectiveness that results from testing only applications was "offset" by the benefits of greater voluntariness in implementation; conversely, I find that the lesser voluntariness afforded by the NOPD program by virtue of the inclusion of current members of the listed units is offset by the greater effectiveness of the program in achieving its purposes.[13]

The duties of the members of the covered NOPD units do not uniformly relate as directly to the enforcement of the drug laws as did the duties of the Customs Service personnel in *Von Raab*, and unlike the case in *Von Raab*, the officers who are currently members of the covered units can be observed in the environment concerned. Yet the duties of the members of the covered NOPD units strongly relate to the concerns for the integrity of police operations that justify the search, and the practical ability to detect lack of integrity through direct observation on the job seems less than certain.

Weighing all of the relevant factors, I conclude that the NOPD drug screening urinalysis program as currently implemented is reasonable and therefore comports with the requirements of the Fourth Amendment.

Accordingly,

IT IS ORDERED that plaintiffs' application for a permanent injunction is DENIED.

APPENDIX A
DEPARTMENT OF POLICE
INTEROFFICE CORRESPONDENCE

DATE: JULY 13, 1988

TO: ALL MEMBERS OF S.I.D.

FROM: WARREN G. WOODFORK, SR. SUPERINTENDENT OF POLICE

SUBJECT: S.I.D. POLICY FOR URINALYSIS

The Superintendent and members of the Major Staff have become increasingly aware of the impact that pervasive drug use has had on crime in New Orleans. More crime is drug related and more police resources are being dedicated to narcotics enforcement than ever before. Because of the sensitive nature of these investigations, it is crucial for the integrity of police operations to be maintained. The following policy is being implemented to protect not only the chain of evidence, but also the officers' personal reputations as well.

Beginning immediately, all members of the Major Staff, the Special Investigations Division, the Internal Affairs Section, the Special Integrity Unit and the Public Affairs Section will be asked to participate in a drug screening urinalysis program. This will also include officers who are detailed to S.I.D. on temporary assignments. All members of the Major Staff have agreed to participate in the program. Any member of the units listed above who for whatever personal reasons chooses not to participate will be reassigned to other duties. No punitive action will be taken and every attempt will be made to assign the officer to a unit of his choosing.

In the future, all officers wishing to transfer to S.I.D. or work on a detailed basis will be considered only if they submit to the drug screening urinalysis. Everyone in S.I.D. will be tested within a specified period of time. The order in which they are tested will be determined randomly.

The following procedures will apply for drug screening urinalysis:

(1) Independent, privately operated labs will be utilized for all drug testing.

(2) Commanding officers will assign numbers to each urine sample and it will be the commander's responsibility to insure the confidentiality of the list.

(3) The primary lab selected will collect and maintain the urine samples and

---

**13.** Indeed, at least one member of the panel seemingly would conclude that this greater effectiveness more than offsets the lesser voluntariness. *See id.* at 184 (Hill, J., dissenting).

will deliver the results directly to the Superintendent. No mention will be made of false positives in any official correspondence.

(4) In the event that the results register positive, the primary lab will verify the results through a confirmation and if the positive reading is confirmed, the primary lab will transport the sample to the secondary lab for yet another test. The officer's commander will be notified only after the third positive reading has been registered.

(5) Any officer who receives three positive readings for illegal drugs will be subject to administrative disciplinary action. At this point, a report of the findings will become part of the disciplinary process. Nothing discovered in the course of these tests will be used in any criminal proceedings.

(6) Tests which were ordered because there was probable cause to suspect a member of wrongdoing will not be covered by this policy. These tests, done to preserve operational integrity, are not to be confused with disciplinary investigations. For information on disciplinary procedures see Rule 3 or ASOP 6.

In recognition of the fact that officers assigned to S.I.D. are constantly exposed to illegal drugs, a special procedure will be established to document each instance where an officer believes that any type of ingestion of illegal substances may have taken place.

(1) The officer will report the incident as soon as possible to his commanding officer in order that it might be documented. A first report of injury form should be used for this purpose. The correspondence will include: date, time, location, names of defendants or possible defendants, witnesses present, type of drug and manner of possible ingestion.

(2) Section commanders will determine if drug screening urinalysis is warranted for the officers' protection.

(3) A copy of the officer's correspondence will be placed in his personnel file.

/s/ Warren G. Woodfork, Sr.
WARREN G. WOODFORK, SR.
Superintendent of Police

WGW:tlh